1   Benno Ashrafi, Esq. (CSBN 247623)
2   *bashrafi@weitzlux.com*
    Josiah Parker, Esq. (CSBN 278703)
3   *jparker@weitzlux.com*
    WEITZ & LUXENBERG, P.C.
4   1880 Century Park East, Suite 700
5   Los Angeles, California 90067
    Telephone: (310) 247-0921
6   Facsimile:  (310) 786-9927
7
8   Attorneys for Plaintiffs

9
10              **UNITED STATES DISTRICT COURT**
11             **NORTHERN DISTRICT OF CALIFORNIA**
12

13  WILLIAM DAVIDSON, an individual;     CASE NO.  3:16-cv-05766-JCS
    PEARL DAVIDSON, an individual;
14                                       **DECLARATION OF JOSIAH**
15              Plaintiffs,              **PARKER IN SUPPORT OF**
         v.                              **PLAINTIFFS' MOTION TO**
16                                       **REMAND FOR LACK OF SUBJECT**
17  ALCATEL-LUCENT USA INC., et al.     **MATTER JURISDICTION**

18                                       Hearing Date:     December 2, 2016
19              Defendants.              Time:             9:30 A.M.
                                         Place:            Courtroom G
20                                       Judge:            Hon. Joseph C. Spero
21
22                                       Complaint Filed:   July 29, 2016
                                         Trial Date:        None Set
23
24
25
26
27
28

---
- 1 -
DECLARATION OF JOSIAH PARKER IN SUPPORT OF PLAINTIFFS' MOTION TO REMAND FOR LACK OF SUBJECT
MATTER JURISDICTION

WEITZ & LUXENBERG P.C.
A PROFESSIONAL CORPORATION
LAW OFFICES
1880 CENTURY PARK EAST, SUITE 700
LOS ANGELES, CALIFORNIA 90067

I, JOSIAH PARKER, declare:

1.      I am an attorney at law duly licensed to practice before all the courts in the State of California, and am an associate in the law firm of WEITZ & LUXENBERG, P.C., attorneys of record for Plaintiffs herein.  I personally know the matters set forth below and could competently testify to them.

2.      Attached herein as Exhibit A is a true and correct copy of Plaintiffs' Motion for Preference and supporting documentation filed in Alameda Superior Court.

3.      Attached herein as Exhibit B is a true and correct copy of Alaska Statehood Act, Pub.L. 85-508, § 11(b), 72 Stat. 347.

4.      Attached herein as Exhibit C is a true and correct copy of the Court Register of Action and Tentative Advancing the Hearing Date and Granting the Motion for Preference.

I declare under penalty of perjury under the laws of the United States of American and the State of California that the foregoing is true and correct.

Executed on October 13, 2016 at Los Angeles, California.

_____
Josiah Parker
Declarant

DECLARATION OF JOSIAH PARKER IN SUPPORT OF PLAINTIFFS' MOTION TO REMAND FOR LACK OF SUBJECT MATTER JURISDICTION

# EXHIBIT A

COPY

ENDORSED
FILED
ALAMEDA COUNTY

SEP 2 3 2016

CLERK OF THE SUPERIOR COURT
By _____ Deputy

1   Benno Ashrafi, Esq. (CSBN 247623)
    Leonard Sandoval, Esq. (CSBN 273992)
2   WEITZ & LUXENBERG, P.C.
    1880 Century Park East, Suite 700
3   Los Angeles, California 90067
    Tel.: (310) 247-0921
4   Fax: (310) 786-9927

5

6   Attorneys for Plaintiffs

7          SUPERIOR COURT OF THE STATE OF CALIFORNIA

8               FOR THE COUNTY OF ALAMEDA

9

10  WILLIAM DAVIDSON, an individual;        CASE NO.  RG16825351
    PEARL DAVIDSON, an individual;          *[Assigned to the Honorable Judge Brad Seligman,
11                                          Department 30]*

                    Plaintiffs,
12                                          **PLAINTIFFS' NOTICE OF MOTION AND**
         v.                                 **MOTION FOR PREFERENCE IN TRIAL**
13                                          **SETTING PURSUANT TO C.C.P § 36(a) and**
    ALCATEL-LUCENT USA INC., et al.         **(d); MEMORANDUM OF POINTS AND**
14                                          **AUTHORITIES, DECLARATION OF**
                                            **LEONARD SANDOVAL; DECLARATION OF**
15       Defendants.                        **DR. ERIC PRESSER**

16

17                                          DATE:           October 21, 2016
                                            TIME:           9:31 a.m. PST
18                                          DEPT:           30
                                            RESERVATION No.: R-1784443
19

20                                          Complaint Filed:  July 29, 2016

21

22

23

24

25

26

27

28

                                    - i -

BY FAX

WEITZ & LUXENBERG P.C.
A PROFESSIONAL CORPORATION
LAW OFFICES
1880 CENTURY PARK EAST, SUITE 700
LOS ANGELES, CALIFORNIA 90067

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on October 21, 2016, at 9:31 a.m., or as soon as counsel may be heard in Department 30 of the Alameda County Superior Court, located at U.S. Post Office Building, 201 13th Street, Oakland, CA 94612, Plaintiffs will and hereby move the Court for an Order granting trial preference, pursuant to Code of Civil Procedure §36(a) and §36(d) (based on imminent death).

Plaintiffs move the court for an order granting trial preference, pursuant to Code of Civil Procedure C.C.P. § 36(a) and § 36(d) on the grounds that (1) Plaintiff William Davidson is 82 years old and dying of terminal cancer and; (2) Mr. Davidson has a substantial interest in this case as he is a Plaintiff.  As set forth again below, there is substantial medical doubt that Mr. Davidson will survive beyond 3 months and the interests of justice are served by the granting of this motion and setting a trial date within the **50 days**[1].

Plaintiff William Davidson is 82 years old and dying of terminal cancer: Mr. Davidson's health is such that preference in trial setting is necessary to avoid prejudicing his ability to have his day in court.  Mr. Davidson was diagnosed on May 13, 2016 with mesothelioma, a particularly aggressive and terminal cancer, and his prognosis is very poor. Shortly thereafter, Plaintiff filed his complaint on May 20, 2015.  Since it is certain that Mr. Davidson's health will rapidly deteriorate, his ability to physically or emotionally participate meaningfully in his lawsuit will become more compromised as each day passes. Mr. Davidson, as a Plaintiff has a substantial interest in this litigation. Thus, all possible steps must be taken to expeditiously resolve Mr. Davidson's legal claims.

There is substantial doubt of Mr. Davidson's survival beyond 3 months: Pursuant to section 36(d), this motion is supported by correspondence from Mr. Davidson's treating oncologist, Dr. Julie Hersch, and the declaration of Dr. Presser, who has thoroughly reviewed Mr. Davidson's case.  Dr. Presser is a Board Certified Thoracic and Cardiac Surgeon, and also a member of the American Association for Thoracic Surgery and The Society of Thoracic Surgeons. Both Dr. Hersch and Dr.

---

[1] Rather than burden the Court with *ex parte* papers and hearing, Plaintiffs have noticed this motion regularly, but are working with Defendants to advance the hearing and shorten time via stipulation and order. Should an agreement be reached and the hearing date be advanced, Plaintiffs would be willing to modify their 50-day request accordingly.

WEITZ & LUXENBERG P.C.
A PROFESSIONAL CORPORATION
LAW OFFICES
1880 CENTURY PARK EAST, SUITE 700
LOS ANGELES, CALIFORNIA 90067

1  Presser agree that there is a reasonable degree of medical certainty that Mr. Davidson **will not**

2  **survive beyond the next three months**.

3       For these reasons, Plaintiffs request that the Court grant this motion and set the trial within 50

4  days of the granting of this motion to avoid causing Plaintiff undue prejudice and irreparable harm.

5       Said motion shall be based upon Code of Civil Procedure §36(a) and §36(d), which provides

6  for preferential trial setting in the case of a plaintiff who suffers from a medical condition giving rise

7  to substantial medical doubt as to their ability to survive beyond three months, or to a plaintiff is over

8  seventy years of age and has a substantial interest in the case.  Plaintiff William Davidson has met

9  both the conditions of Code of Civil Procedure §36(a) and §36(d). As the declaration of Dr. Presser

10  states, Mr. Davidson is terminally ill and is in imminent danger of dying within 3 months.  As such,

11  Plaintiff's interests in adjudicating this matter will be severely prejudiced, if this motion for trial

12  preference is not granted.

13       As required by Code of Civil Procedure section 36(c)(1), all essential parties have been served

14  with process or have appeared in this action.

15

16  DATED:  September 23, 2016              **WEITZ & LUXENBERG, P.C**.

17

18                                   By: _____

19                                       Leonard Sandoval
                                        Attorney for Plaintiffs

20

21

22

23

24

25

26

27

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PREFERENCE IN TRIAL SETTING PURSUANT TO C.C.P § 36(a) and (d);
MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF LEONARD SANDOVAL; DECLARATION OF DR. ERIC PRESSER

WEITZ & LUXENBERG, P.C.
A PROFESSIONAL CORPORATION
LAW OFFICES
1880 CENTURY PARK EAST, SUITE 700
LOS ANGELES, CALIFORNIA 90067

WEITZ & LUXENBERG P.C.
A PROFESSIONAL CORPORATION
LAW OFFICES
1880 CENTURY PARK EAST, SUITE 700
LOS ANGELES, CALIFORNIA 90067

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION AND RELEVANT FACTS

This is an action for the personal injuries arising out of Plaintiff William Davidson's exposure to asbestos and asbestos-containing products manufactured, distributed and/or supplied by Defendants. Plaintiff's Complaint was filed on July 29, 2016 and as of this date all defendants have been served with the First Amended Complaint and/or have answered. (Declaration of Leonard Sandoval ("Sandoval Dec.") ¶ 3.)

Mr. Davidson was born on January 4, 1934, and is currently 82 years of age. (Declaration of Eric Presser, M.D. ("Presser Decl.") ¶ 6.)  Mr. Davidson is a party to this case, and as such, has a substantial interest in the action.  (Sandoval Dec. ¶ 4.)  On May 13, 2016, Mr. Davidson underwent a left thoracoscopy, pleural biopsy and talc pleuradesis, which resulted in a diagnosis of malignant pleural mesothelioma.   (Presser Decl. ¶ 7.) Mr. Davidson has lost over thirty pounds since his diagnosis of mesothelioma and has recently transitioned to hospice and comfort care because the pain in his back and left chest require him to take narcotics daily to help him function. (Presser Decl. ¶ 9.)  He can no longer go out to dinner, visit friends, drive his car, play golf, or bowl and the simple acts of doing chores around the house or walking from one room to another make him dizzy and/or short of breath. (Id.) The only treatment option offered since diagnosis was chemotherapy because of his age and disease progression, however Mr. Davidson and his wife declined because his quality of life was declining and he didn't want to accelerate the process. (Presser Decl. ¶ 8.) Mr. Davidson's mesothelioma is incurable.  Within a reasonable degree of medical certainty, Mr. Davidson's health and condition will shortly deteriorate, ultimately culminating in his death.  (Presser Decl. ¶ 12.)  Dr. Julie Hersch, Mr. Davidson's treating oncologist, has provided him with a **life expectancy of approximately 2-3 months**. (Exhibit "C" to Presser Decl., September 22, 2016 letter from Dr. Hersch.) Further, Plaintiffs' expert, Dr. Presser consulted with Mr. Davidson and reviewed his medical records an came to the same conclusion that within a reasonable degree of medical certainty that there is **substantial medical doubt of Mr. Davidson's survival beyond an additional three months**. (Presser Decl. ¶ 14.)

- 1 -

WEITZ & LUXENBERG P.C.
A PROFESSIONAL CORPORATION
OFFICES
1880 CENTURY PARK EAST, SUITE 700
LOS ANGELES, CALIFORNIA 90067

1    Because mesothelioma is incurable and there is substantial medical doubt that Mr. Davidson

2  will live beyond 3 months, it is critical that he be granted preference so that he can have a chance of

3  seeing justice prevail prior to his passing. If Mr. Davidson is given the opportunity to present his

4  claims to a jury while he is living, the considerable pain, suffering and anxiety that he has and will

5  endure will be compensable in the form of a substantial award of general damages. However, under

6  California law, if Mr. Davidson dies of his injuries *before* the jury returns a verdict, the defendants

7  are instantly relieved of *all* obligations to compensate the plaintiff, or anyone else, for his pain and

8  suffering.  (Code of Civil Procedure §377.34.)

9    Fortunately, the California Legislature has provided terminally-ill plaintiff, like Mr.

10  Davidson with some hope to avoid the harsh effects of Code of Civil Procedure §377.34.  Through

11  Code of Civil Procedure §36(a) and §36(d), some measure of justice and closure is afforded dying

12  plaintiffs with a preferential trial date. As such, Plaintiffs request this Court grant a preferential trial

13  date within 50 days.

14  **II.    SECTION 36(a) MANDATES TRIAL PREFERENCE FOR PLAINTIFFS OVER THE**

15  **AGE OF 70 SUFFERING FROM MESOTHELIOMA**

16  California Code of Civil Procedure Section 36(a) specifically provides, in pertinent part:

17    A party to a civil action who is over the age of 70 years may petition
     the court for a preference, which the court *shall* grant if the court
18    makes all of the following findings:
     (1)    The party has a substantial interest in the action as a whole.
19    (2)    The health of the party is such that a preference is necessary to
            prevent prejudicing the party's interest in the litigation.

20    The relevant case law explains that preference is mandatory under CCP § 36(a) under the

21  present circumstances. In  *Rice v. Superior Court (Times-Mirror Co.)*, the question presented was

22  whether Code of Civil Procedure section 36, subdivision (a), which provides that "a civil case shall be

23  entitled to preference upon motion of any party to such action who has reached the age of 70 years...."

24  was intended by the Legislature to be mandatory or directory and the court concluded that the

25  language of section 36, subdivision (a) of the Code of Civil Procedure was intended by the

26  Legislature to be mandatory and thus requires that a litigant qualifying under its terms be given

27  preferential trial setting irrespective of the circumstances leading to the motion for preference.  *Rice v.*

28

WEITZ & LUXENBERG P.C.
A PROFESSIONAL CORPORATION
LAW OFFICES
1880 CENTURY PARK EAST, SUITE 700
LOS ANGELES, CALIFORNIA 90067

*Superior Court (Times-Mirror Co.)* (1982) 136 Cal.App.3d 81, 84-89.

It is undisputed that Mr. Davidson is 82 years old. It is also undisputed that Mr. Davidson has a substantial interest in the action as a whole as a Plaintiff in this case. If Mr. Davidson passes away before trial, any recovery of damages for his pain and suffering will be precluded by law, resulting in the loss of a significant and important remedial right.  (*Civ. Proc. Code* § 377.34; *see also County of Los Angeles v. Superior Court* (1999) 21 Cal.App.4th 292, 295-96.)  In that event, the very purpose and function of Section 36 will have been contravened and frustrated, since the statute was enacted to ensure that persons who are elderly or seriously ill are not deprived of their civil litigation rights, including their full measure of damages, by dying prior to trial. (*See*, *e.g.*, *Greenblatt v. Kaplan's Restaurant* (1985) 171 Cal.App.3d 991, 994-95.)

Further, preference is necessary in this instance to protect Mr. Davidson interest in the litigation because he is dying from mesothelioma. There is no probability that any treatment will cure Mr. Davidson of mesothelioma. Within a reasonable degree of medical certainty, Mr. Davidson will not survive beyond the next three months. It is clear that Mr. Davidson should be given trial preference under Code of Civil Procedure § 36(a) because of his age and terminal cancer.

a) **A Motion Under Code of Civil Procedure Section 36(a) Need Not Be Supported By A Declaration From A Physician**

California Code of Civil Procedure section 36.5 specifically states that an "affidavit submitted in support of a motion for preference under subdivision (a) of Section 36 may be signed by the attorney for the party seeking preference based upon information and belief as to the medical diagnosis and prognosis of any party."

The statute expressly provides that the motion may be supported by a declaration of counsel based on information and belief as to the medical diagnosis and prognosis of any party, as are the circumstances in this instance. Also, as noted in Weil & Brown, "only the attorney seeking the Section 36(a) preference can give such a declaration. To controvert it, opposing counsel must obtain competent medical or other evidence" (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2012) ¶ 12:247.4 (exclamation in original.)) Moreover, an attorney's

- 3 -

1    declaration used for the purposes of Section 36(a) "can consist entirely of hearsay and conclusions."

2    (*Id.* at ¶ 12:247.1.; Code Civ. Proc. § 36(a).)

3         Here, plaintiffs have gone above and beyond the requirements set forth in Section 36(a) and

4    provided the Court with statements from **two doctors** with regard to Mr. Davidson's grave prognosis.

5    **b) Mr. Davidson Suffers the Ultimate Prejudice if Immediate Trial Preference is Not**

6         **Granted**

7         A litigant's right to have timely access for his or her day in court is an important right, one

8    that fulfills a legitimate state purpose. (*Landry v. Berryessa Union School Dist.* (1995) 39

9    Cal.App.4th 691, 46 Cal.Rptr.2d 119.)  When physical health threatens or looms to extinguish one's

10   day in court or the ability to meaningfully participate, the law provides an immediate remedy in the

11   form of special trial preference. (*Looney v. Superior Court* (1993) 16 Cal.App. 4th 521, 20

12   Cal.Rptr.2d 182; Code Civ. Proc. § 36.)

13        If the plaintiff does not receive a trial preference, the prejudice to Mr. Davidson's interests in

14   the case will be absolute. If Mr. Davidson presents his case to a jury while he is living, the

15   considerable pain, suffering and anxiety that he will endure will be compensable in the form of a

16   substantial award of general damages. However, under California law, if Mr. Davidson dies of his

17   injuries *before* the jury returns a verdict, the defendants are instantly relieved of *all* obligations to

18   compensate the Plaintiff, or anyone else, for his pain and suffering. This surprising outcome is the

19   result of Code of Civil Procedure §377.34, which states that upon the plaintiff's death, his personal

20   representative can continue to prosecute the case, but damages for pain and suffering are no longer

21   recoverable.

22        Any perceived prejudice the Defendants face can be mitigated, if not outright neutralized

23   with a Trial Setting Order ("TSO"). A TSO allows the parties to set deadlines, guidelines, and

24   limitations on discovery so that all parties are afforded an opportunity to meaningfully participate in

25   the case.  For example, Plaintiffs are willing to agree to waive the statutorily mandated notice period

26   of 75 days for motions for summary judgment, and accept such notice of those motions on a much

27   shorter timeframe for any defendant willing to stipulate to a preferential trial date. Plaintiffs further

28   propose that the court issue orders so that: 1) no party may suspend a deposition without all parties

WEITZ & LUXENBERG P.C.
A PROFESSIONAL CORPORATION
LAW OFFICES
1880 CENTURY PARK EAST, SUITE 700
LOS ANGELES, CALIFORNIA 90067

- 4 -

first calling to mediate the issues with the Court; 2) all discovery motions may be brought on 10 days shortened time, with five days for an opposition and that replies be reserved; 3) the parties may participate in a telephonic discovery mediation with the Court prior to filing motions; and finally; 4) all written discovery responses shall be due 14 days after service is perfected. (Sandoval Dec. ¶ 5.)

Despite being familiar with and knowing that a TSO can alleviate most prejudice, Defendants will still argue to delay trial.

**c)**  **A Trial Date Upon Certain Conditions is Improper.**

Plaintiffs anticipate that defendants will request that certain conditions - e.g., discovery disclosures or summary judgment schedules - be set by the Court if it grants this motion. However, no "discretion to balance interests is permitted by subdivision (a) of the statute [CCP § 36]." *Koch-Ash v. Sup. Ct.* (1986) Cal.App.3d 689, 694.

> "If trial courts are permitted to make administrative inroads into the section 36 mandate, the effectiveness of that mandate will be eviscerated, if only to the extent that a litigant's section 36 rights will be jeopardized while appellate courts review circumstances seen by trial courts as justifying their revocation of trial preferences upon their own re-balancing of interests. If trial courts, believe that certain exceptions to section 36 are necessary in complex, consolidated actions, their remedy lies in persuading the Legislature to amend the absolute language of section 36, subdivision (a) to provide appropriate exceptions." *Koch-Ash, supra,* 180 Cal.App.3d 689, 698-699.

The inability of a defendant "to complete discovery or other pre-trial matters does not affect the absolute substantive right to trial preference for those litigants who qualify for preference under subdivision (a) of section 36. The trial court has no power to balance the differing interests of opposing litigants in applying the provision." *Swaithes, supra,* 212 Cal.App.3d 1082, 1085. The losing argument in *Swaithes,* an asbestos case, was that defendants did not have time to complete discovery or file motions for summary judgment. Id.

Further, the Trial Court "has no discretion to avoid the command of section 36(a) in the interest of efficient management of the court's docket as a whole." *Miller v. Sup. Ct.* (1990) 221 Cal.App.3d 1200, 1204.

The Appellate Court has also addressed the question of summary judgment briefing schedules. In *McMahon v. Sup. Ct.* (2003) 106 Cal.App.4th 112 the trial court granted a CCP § 36(a) preference motion on condition that the motion for summary judgment notice period was 21 days.

WEITZ & LUXENBERG P.C.
A PROFESSIONAL CORPORATION
LAW OFFICES
1880 CENTURY PARK EAST, SUITE 700
LOS ANGELES, CALIFORNIA 90067

- 5 -

The Court of Appeal held that the Trial Court had no power to shorten or otherwise abridge section 437c(a)'s mandatory minimum notice period for filing and serving motions for summary judgment. Id., 114-115. This principle has been upheld every time it has come up in a published opinion. See, *Urshan v. Musicians' Credit Union* (2004) 120 Cal.App.4th 758, 767; *Boyle v. Certainteed Corp.* (2006) 137 Cal.App.4th 645; and *Robinson v. Woods* (2008) 168 Cal.App.4th 1258.

The principles of statutory interpretation require a Court to interpret statutes in a way that effectuates the intent of the Legislature. *Landrum v. Sup. Ct.* (1981) 30 cal.3d 1, 12. Likewise, uncontradicted decisions of any division or district of the California Court of Appeal binds the Trial Court. *Auto Equity Sales v. Sup. Ct.* (1962) 57 Cal.2d 450, 455-456.

The law is clear: persons over age 70, who are in dire health, are entitled to a preferential trial date without condition or consideration of any competing rights, calendar management, or the ability of defendants to conduct discovery or file motions for summary judgment.

**d)  Defendants Have A Financial Incentive To Delay Prosecution Of This Case**

The Defendants in this case have a very strong incentive to delay the trial. The further away the trial date the greater the likelihood that the Plaintiff will succumb to cancer and die. If this happens, the Defendants will not have to compensate him for his substantial pain and suffering. The delay of the trial is a goal that will be pursued in a variety of different ways.  Defendants will ask this Court to enforce very creative and fictional legal prerequisites regarding Plaintiff's motion, when in fact no such prerequisites exist in statute. They will argue that the discovery and motion burden they would have to deal with outweighs the prejudice Mr. Davidson would suffer if he dies before the jury returns a verdict.

When the Defendants are unsuccessful with these arguments, they will then urge the Court to avoid exercising any discretion in selecting a trial date – they will ask for the maximum time permitted by the statute.  They will justify this request with verbose language citing the extreme, dire, and insurmountable conditions they will encounter if they had to prepare for trial for one minute less than the maximum time. The Court should view any of these arguments with great skepticism.  These arguments often cite theoretical hardships, phantom issues, and trumped up hardships.

The truth is that if all of the parties make the preparation of this case a priority, the case can

WEITZ & LUXENBERG P.C.
A PROFESSIONAL CORPORATION
LAW OFFICES
1880 CENTURY PARK EAST, SUITE 700
LOS ANGELES, CALIFORNIA 90067

be ready for trial in less than 50 days. Based upon the fact that Mr. Davidson is in imminent danger of dying, Plaintiff respectfully requests that this Court set a trial date within 50 days from the date of the granting of this motion.

### III.   A PREFERENTIAL TRIAL SETTING MUST BE GRANTED WHEN PLAINTIFF SUFFERS FROM A TERMINAL DISEASE WITH SUBSTANTIAL MEDICAL DOUBT OF SURVIVAL BEYOND THREE MONTHS

Code of Civil Procedure § 36(d), states in pertinent part:

> In its *discretion*, the court may also grant a motion for preference that is accompanied by clear and convincing medical documentation that concludes that one of the parties suffers from an illness or condition raising substantial medical doubt of survival of that party beyond three months, and that satisfies the court that the interests of justice will be served by granting the preference.

A litigant's right to have timely access for his or her day in court is an important right, one that fulfills a legitimate state purpose. (*Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 46 Cal.Rptr.2d 119.)  When physical health threatens or looms to extinguish one's day in court or the ability to meaningfully participate, the law provides an immediate remedy in the form of special trial preference. (*Looney v. Superior Court* (1993) 16 Cal.App. 4th 521, 20 Cal.Rptr.2d 182; Code of Civil Procedure § 36(d).)

Code of Civil Procedure §36(d) provides that, upon presentation of clear and convincing medical documentation establishing substantial medical doubt as to the ability of the plaintiff to survive beyond three months, such a plaintiff is entitled to receive a trial date no more than 120 days from the date of the motion for preference of trial.

Plaintiff offers the Declaration of Dr. Eric Presser, which satisfies the requirements of §36(d).  Dr. Presser explicitly states that: "Based on my personal knowledge obtained from my education, training and experience, and my treatment and review of medical records pertaining to the diagnosis and treatment of Mr. Davidson's malignant mesothelioma, it is my opinion within a reasonable degree of medical certainty that there is substantial medical doubt of Mr. Davidson's survival beyond an additional three months." (Presser Decl. ¶ 14.)

WEITZ & LUXENBERG P.C.
A PROFESSIONAL CORPORATION
LAW OFFICES
1880 CENTURY PARK EAST, SUITE 700
LOS ANGELES, CALIFORNIA 90067

- 7 -

**WEITZ & LUXENBERG P.C.**
A PROFESSIONAL CORPORATION
LAW OFFICES
1880 CENTURY PARK EAST, SUITE 700
LOS ANGELES, CALIFORNIA 90067

1    Given the substantial medical doubt of Mr. Davidson's survival beyond 3 months, any

2 significant delays will consume a disproportionate amount of Mr. Davidson's remaining life

3 expectancy, and cause his undue prejudice and irreparable harm by, among other things, making it

4 likely that he does not survive for trial.

5    Fortunately, the California Legislature has provided terminally-ill plaintiffs, like Mr.

6 Davidson, some measure of justice under Code of Civil Procedure §36(d). This section of the code

7 allows this Court to grant a plaintiff a preferential trial date. As articulated above, the interests of

8 justice will be served by giving Mr. Davidson a preferential trial date, so that he is given the same

9 opportunity as someone whose death is not imminent: a fair chance to recover for the full extent of

10 his injuries.

11    Accordingly, as Mr. Davidson's rights and interests are best served in this case by the grating

12 of trial preference, so that he will have a fighting chance of bringing his claims before this Court and

13 a jury before he weakens and passes away, Plaintiff urges this court to grant preference and advance

14 the trial date to one within 50 days.

15 **IV.    PLAINTIFF REQUESTS A TRIAL WITHIN 50 DAYS OF THE HEARING ON THIS**

16    **MOTION**

17    California Rules of Court, Rule 3.729(2), provides that in setting a case for trial, the Court

18 must take into account "whether the case has statutory priority."  Rule 3.1335 provides that, upon

19 noticed motion and showing of good cause, a party may move the Court to advance a case for trial

20 under Code of Civil Procedure section 36.

21    Code of Civil Procedure section 36(f) provides that, after granting a motion for preference, the

22 court must set the matter for trial "no more than" 120 days from the date of the order. Here, Plaintiff

23 respectfully submits the interests of justice are served by an Order setting this case for trial within 50[2]

24 days of the hearing on this Motion.

25    There are only three defendants in this case and all are represented by the same counsel.

26 Plaintiffs have served responses to standard interrogatories, provided defendants with voluminous

27

28

---

[2] Rather than burden the Court with *ex parte* papers and hearing, Plaintiffs have noticed this motion regularly, but are working with Defendants to advance the hearing and shorten time via stipulation and order. Should an agreement be reached and the hearing date be advanced, Plaintiffs would be willing to modify their 50-day request accordingly.

- 8 -

1  medical records and the deposition of Mr. Davidson will commence on Tuesday, September 27,

2  2016. (Sandoval Dec. ¶ 6.)  Given this, and the concessions Plaintiffs propose with regard to a trial

3  setting order, Plaintiffs believe that this matter should be ready for trial within 50 days from the

4  granting of this motion.

5  Given the fact that Mr. Davidson's health continues to deteriorate and the fact that two

6  doctors have given him a 2-3 month prognosis, his ability to physically or emotionally participate

7  meaningfully in his lawsuit will become severely compromised, Plaintiffs believe that trial within 50

8  days is reasonable. As this Court previously granted preference in this matter, it is imperative that Mr.

9  Davidson see his day in Court as soon as possible. Therefore, all possible steps must be taken to

10  expeditiously resolve Mr. Davidson's legal claims while he can still meaningfully participate in this

11  legal claim.

12  **V.    CONCLUSION**

13  The Plaintiff William Davidson has presented clear and convincing evidence that he over the

14  age of seventy (70) years old and has a substantial interest in this action.  Given Plaintiff's failing

15  health, if Mr. Davidson does not receive a preferential trial date, the prejudice to Mr. Davidson in this

16  case will be absolute.  Therefore, in the interests of justice, he should be granted a trial date within 50

17  days.  Statutorily, he is entitled to receive a trial date *no more than* 120 days from the date of this

18  motion for trial preference.

19

20  DATED:  September 23, 2016                    **WEITZ & LUXENBERG, P.C**.

21

22                                                           By:  _____

23                                                                    Leonard Sandoval
                                                                   Attorney for Plaintiffs

24

25

26

27

28

WEITZ & LUXENBERG, P.C.
A PROFESSIONAL CORPORATION
LAW OFFICES
1880 CENTURY PARK EAST, SUITE 700
LOS ANGELES, CALIFORNIA 90067

- 9 -

WEITZ & LUXENBERG P.C.
A PROFESSIONAL CORPORATION
LAW OFFICES
1880 CENTURY PARK EAST, SUITE 700
LOS ANGELES, CALIFORNIA 90067

## DECLARATION OF LEONARD SANDOVAL

I, Leonard Sandoval, declare:

     1.   I am an attorney at law admitted to practice before all the Courts of the State of California, and am a lawyer with the law firm of Weitz & Luxenberg, P.C., attorneys for the Plaintiff William Davidson.

     2.   I make this declaration in support of Plaintiff's Motion for Preference pursuant to Code of Civil Procedure section 36(a) and (d). If called upon to do so, I could and would competently testify to the following from personal knowledge.

     3.   This is an action for the personal injuries arising out of Plaintiff William Davidson's exposure to asbestos and asbestos-containing products manufactured, distributed and/or supplied by Defendants. Plaintiff's Complaint was filed on July 29, 2016 and as of this date all defendants have been served with the First Amended Complaint and/or have answered.

     4.   Mr. Davidson is a party to this case, and as such, has a substantial interest in the action.

     5.   Plaintiffs are willing to agree to waive the statutorily mandated notice period of 75 days for motions for summary judgment, and accept such notice of those motions on a much shorter timeframe for any defendant willing to stipulate to a preferential trial date. Plaintiffs further propose that the court issue orders so that: 1) no party may suspend a deposition without all parties first calling to mediate the issues with the Court; 2) all discovery motions may be brought on 10 days shortened time, with five days for an opposition and that replies be reserved; 3) the parties may participate in a telephonic discovery mediation with the Court prior to filing motions; and finally; 4) all written discovery responses shall be due 14 days after service is perfected.

     6.   There are only three defendants in this case and all are represented by the same counsel. Plaintiffs have served responses to standard interrogatories, provided defendants with voluminous medical records and the deposition of Mr. Davidson will commence on Tuesday, September 27, 2016.

- 1 -

1    I declare under penalty of perjury under the laws of the State of California that the foregoing

2    is true and correct.

3    Executed on September 23, 2016 at Los Angeles, California.

4

5    _____

6    LEONARD SANDOVAL

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PREFERENCE IN TRIAL SETTING PURSUANT TO C.C.P § 36(a) and (d);
MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF LEONARD SANDOVAL; DECLARATION OF DR. ERIC PRESSER

**WEITZ & LUXENBERG P.C.**
A PROFESSIONAL CORPORATION
LAW OFFICES
1880 CENTURY PARK EAST, SUITE 700
LOS ANGELES, CALIFORNIA 90067

WEITZ & LUXENBERG P.C.
A PROFESSIONAL CORPORATION
LAW OFFICES
1880 CENTURY PARK EAST, SUITE 700
LOS ANGELES, CALIFORNIA 90067

## DECLARATION OF DR. ERIC PRESSER

I, ERIC R. PRESSER., declare:

1.      I am a licensed physician in the State of California and New York with offices at 1180 N. Indian Canyon Drive, Palm Springs, CA  92262.

2.      I obtained my medical degree from Ross University School of Medicine in 1999 and completed my Surgical Internship and Residency in General Surgery at St Vincents Hospital and Medical Center in New York, NY.  Following that I trained at Louisiana State University in New Orleans as a cardiothoracic fellow and then went on to complete my cardiothoracic fellowship at the University of Texas in San Antonio.  I have been practicing minimally invasive thoracic surgery since 2006 as both a private practitioner and as a hospital based employee.  I am presently a Board Certified Thoracic and Cardiac Surgeon.  I am also a member of the American Association for Thoracic Surgery and The Society of Thoracic Surgeons.  Attached as Exhibit "A" is a true and correct copy of my CV.

3.      As a board certified thoracic surgeon I am intimately familiar with the epidemiology, diagnosis, staging, prognosis, and treatment of cancers - specifically including lung cancer and mesothelioma.  I have personally treated lung cancer and mesothelioma patients.

4.      The opinions and observations stated below are based on my knowledge obtained from my education, training, and experience.  My opinions are stated within a reasonable degree of medical certainty.

5.      I have personally reviewed medical records relating to the diagnosis and treatment of Mr. William Davidson and, as such, I am familiar with Mr. Davidson's medical condition as well as his medical record as it relates to the course of his disease. The medical records I reviewed are usual and customary and of the type that are ordinarily relied upon in the diagnosis, assessment, and treatment of patients with malignant mesothelioma.

6.      Mr. Davidson is an eighty-two year old male. His date of birth is January 4, 1934.

- 1 -

WEITZ & LUXENBERG P.C.
A PROFESSIONAL CORPORATION
LAW OFFICES
1880 CENTURY PARK EAST, SUITE 700
LOS ANGELES, CALIFORNIA 90067

7.     Mr. Davidson has a past medical history significant for esophageal and prostate cancer, stroke, COPD, seizures, spinal stenosis and asbestos exposure.  Prior to diagnosis, he was complaining of becoming short of breath easily.  On a PET scan performed March 2016 a large left pleural effusion with hypermetabolic pleura was found.  On May 13, 2016, Mr. Davidson underwent a left thoracoscopy, pleural biopsy and talc pleuradesis which resulted in a diagnosis of malignant pleural mesothelioma.   (Attached as Exhibit "B" is a true and correct copy of the pathology I reviewed confirming Mr. Davidson's malignant mesothelioma)

8.     After his diagnosis Mr. Davidson met and spoke with his oncologist many times.  The only option offered was chemotherapy because of his age and disease progression.  Mr. Davidson (and his wife) decided to not have chemotherapy because he knew how sick and debilitating it made him while being treated for his esophageal cancer in the recent past.  His quality of life was declining and he didn't want to accelerate the process.

9.     I personally spoke to Mr. Davidson on September 22, 2016.  He has lost over thirty pounds since his diagnosis of mesothelioma.  He has recently transitioned to Hospice and comfort care because the pain in his back and left chest require him to take narcotics daily to help him function.  Mr. Davidson chose not to undergo chemotherapy for his mesothelioma because he was afraid he would become too sick to enjoy what little time he has left.  He and his wife have been married over forty years.  Going to a nice dinner or visiting friends is a distant memory because he just doesn't have the energy.  He doesn't enjoy food and vomits up meals on occasion.  He cannot drive a car anymore and simple chores around the home make him dizzy and short of breath.  While walking room to room he has to stop and sit down to catch his breath.  Mr. Davidson used to be active and enjoy playing golf or bowling.  Now he's on home oxygen and I could hear him become short of breath on the phone as we spoke.  The most concerning and stressful issue is the fact that he and his wife adopted their great-grandson thirteen years ago and they cannot take care of him anymore.  This was an extremely emotional topic as you could imagine, since the thought of not seeing him at least graduate high school is devastating.  Mr. Davidson knows he's dying.

10.     Rising pain levels are commonly fought with increasing levels of pain medications, which in turn can cause deterioration of the patient's ability to remember, concentrate, communicate and relate to others.

11.     Mr. Davidson has significant imminent risk of experiencing progression of local disease and/or distant metastatic disease.  His symptoms at that time are expected to include worsening chest wall and abdominal pain, shortness of breath, additional fatigue, and additional weight loss.  Complicating matters further is the risk of intervening infections, including potentially fatal ones.

12.     Mr. Davidson's mesothelioma is incurable.  Within a reasonable degree of medical certainty, Mr. Davidson's health and condition will shortly deteriorate, ultimately culminating in his death.

13.     I have reviewed a letter from Mr. Davidson's treating oncologist, Julie L. Hersch, M.D., in which she states that his life expectancy is approximately 2-3 months. (Attached as Exhibit "C" is a true and correct copy of the September 22, 2016 letter from Dr. Hersch).

14.     Based on my personal knowledge obtained from my education, training and experience, and my review of medical records pertaining to the diagnosis and treatment of Mr. Davidson's malignant mesothelioma, it is my opinion within a reasonable degree of medical certainty that there is substantial medical doubt of Mr. Davidson's survival beyond an additional three months.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this September 23, 2016, at Palm Springs California.

By:  _____

Eric R. Presser, M.D., Declarant

WEITZ & LUXENBERG P.C.
A PROFESSIONAL CORPORATION
LAW OFFICES
1880 Century Park East Suite 700
Los Angeles, CA 90067

- 3 -

# EXHIBIT A

# Eric R. Presser, MD

1180 N. Indian Canyon Drive
Palm Springs, CA  92262
(760) 424-8224
epresser10@gmail.com

**WORK EXPERIENCE**:

**Premier Surgical Associates, Palm Springs, CA**                    May 2012- present
    Attending *Thoracic Surgeon*

**North Shore LIJ Health System,**  Manhasset, NY                    June 2010-April 2012
    *Attending Thoracic Surgeon*, Department of Cardiovascular and Thoracic Surgery

**North Shore LIJ Health System,**  Manhasset, NY                    May-June 2010
    *Thoracic Surgeon*, Department of Thoracic Surgery/ Oncology

**Thoracic Surgical, PC,**  Great Neck, NY                    Sept 2006-May 2010
    *Thoracic Surgeon*

**POST DOCTORAL TRAINING:**

**University of Texas Health Science Center**, San Antonio, TX                    July 2005-June 2006
    *Chief Resident*
    *Cardiothoracic Surgical Fellow*

**LSU Health Science and Medical Center**, New Orleans, LA                    July 2004-June 2005
    *Cardiothoracic Surgical Fellow*

**St. Vincent Hospital and Medical Center**, New York, NY                    July 2000-June 2004
    *Chief Resident*  (Appointed July 2003)
    *Surgical Resident*

**St. Vincent Hospital and Medical Center,** New York, NY                    July 1999- June 2000
    *Surgical Intern*

**EDUCATION:**

**Ross University School of Medicine,** Dominica, WI
    Doctor of Medicine, *With Honors*                    February 1999

**University of Florida,** Gainesville, FL
    Bachelors of Science (Double Minor in Chemistry and Gerontology)                    April 1994
    Alpha Lambda Delta Honor Society

**CERTIFICATION:**

**American Board of Thoracic Surgery**                    May 2009

# EXHIBIT B


**KAISER FOUNDATION HOSPITALS**

SSC-BRUCEVLL HOS
6600 BRUCEVILLE ROAD
.
SACRAMENTO CA 95823-4671
Hospital Record

DAVIDSON,WILLIAM A
MRN: 110002934702
DOB: 1/4/1934, Sex: M
Adm: 5/13/2016, D/C: 5/17/2016

## All Orders and Results (05/13/16 - 05/17/16) (continued)

### Components

| | Value | Ref range | Flag | Comment | Lab |
|---|---|---|---|---|---|
| Report, pathology Result | -- | | | - | 471 |

```
Provider:  JEFFREY SCRANTON MOORE M.D.
Collected: 5/13/2016                    Case #:  SSCS16-8710
                        Surgical Pathology Report
FINAL PATHOLOGIC DIAGNOSIS
LEFT PLEURA (BIOPSY/SCARIFICATION): MESOTHELIOMA, BIPHASIC TYPE.


                    STEVEN FREDERICK BURRALL M.D.
                ** Report Electronically Signed by SFB **
Comment

Dr. Jeffrey G. Moore has reviewed this case and concurs with the
diagnosis. A staff message with the diagnosis was sent to Dr.
Jeffrey Scranton Moore on May 18.


Microscopic Description

Pleural tissue is extensively infiltrated by malignant neoplasm
with both spindle cell and epithelioid components.


Studies

Calretiinin positive; control appropriate.
CK 5/6 positive; control appropriate.
TT F1 negative; control appropriate.
CEA negative in tumor cells; control appropriate.

[DISCLAIMER:  This immunoperoxidase stain/panel was developed and
its performance characteristics determined by  the Kaiser Regional
Immunohistochemistry Laboratory/The Permanente Medical Group,
Inc.,
Northern California, 1725 Eastshore Highway, Berkeley, CA. Unless
otherwise specified, it has not been cleared or approved by the
U.S. Food and Drug Administration (FDA). The FDA has determined
that such clearance or approval is not necessary. This test is
used
for clinical purposes. It should not be regarded as
investigational
or for research. This laboratory is certified under the Clinical
Laboratory Improvement Amendments of 1988 (CLIA-88) as qualified
to
perform high complexity clinical laboratory testing. Positive and
negative controls were evaluated and stained appropriately.]



Clinical History
Pleural biopsy
VATS, pleura scarification, left
Pleural effusion
```



| | | |
|---|---|---|
| SSC-BRUCEVLL HOS | | DAVIDSON, WILLIAM A |
| 6600 BRUCEVILLE ROAD | | MRN: 110002934702 |
| . | | DOB: 1/4/1934, Sex: M |
| SACRAMENTO CA 95823-4671 | | Adm: 5/13/2016, D/C: 5/17/2016 |
| Hospital Record | | |

## All Orders and Results (05/13/16 - 05/17/16) (continued)

```
Gross Description
The container is labeled with the patient's last name, Davidson,
medical record number ending in 702 and labeled as "pleural
biopsy". The container label has been initialed by the provider.
 Received in formalin is a 5.0 x 4.6 x 1.3 cm aggregate of tan-
pink,
hemorrhagic soft tissue. Sections show rubbery and homogeneous cut
surfaces. Representative sections are submitted in A1-A2.


js/5/16/2016
Specimen(s) Received
A:PLEURAL BIOPSY  - LEFT



Patient Name:  DAVIDSON, WILLIAM A
Med. Rec #:  02934702   DOB/Age:  1/4/1934 (Age: 82)   Sex:  M
Facility:  South Sacramento Med Ctr
Location:  INPATIENT NURSING

South Sacramento Pathology
6600 Bruceville Road
Sacramento, CA  95823
Tel: 916-688-2303  Fax: 916-688-6435
Woojin M. Yu, M.D., Laboratory Director
```

**Reviewed by**

Hersch, Julie L (M.D.) on 06/21/16 1825
Parikh, Swapna Rakesh (M.D.) on 05/19/16 1412
Moore, Jeffrey Scranton (M.D.) on 05/19/16 1222

---

## Chlorhexidine Gluconate Oral Soln 15 mL (PERIDEX) [903858105]

Electronically signed by: **Moore, Jeffrey Scranton (M.D.) on 05/05/16 1423**                                    Status: **Completed**
Ordering user: Moore, Jeffrey Scranton (M.D.) 05/05/16 1423          Ordering provider: Moore, Jeffrey Scranton (M.D.)
Authorized by: Moore, Jeffrey Scranton (M.D.)                        Ordering mode: Standard
PRN reasons:
  see admin inst.
Frequency: Routine Periop - one time 05/13/16 1050 - 1  Occurrences          Class: Normal
Released by: Mosley, Jonalyn (R.N.) 05/13/16 1050
Acknowledged:
  Mosley, Jonalyn (R.N.) 05/13/16 1054 for Placing Order
Admin instructions:
  Administer Chlorhexidine Gluconate 0.12% Oral Solution 15mL prior to transfer to the Operating Room.  Swish undiluted for 30 seconds then spit
  out.  Do not swallow.
  Give only if the patient has a postoperative discharge disposition of hospital admission.

---

## Clindamycin in D5W IV Premix 900 mg (CLEOCIN) [903858106]

# EXHIBIT C

# The Permanente Medical Group, Inc.

**HEMATOLOGY/ONCOLOGY DEPT**
**1600 Eureka Road**
**Roseville CA 95661-3027**
**Dept: 916-784-5626**
**Main: 916-784-4000**

September 22, 2016

William A Davidson
2280 Grass Valley Hwy324
Auburn CA 95603-2536

Mr. Davidson is currently under my care for unresectable malignant mesothelioma of the lung. He is currently in hospice and his life expectancy is approximately 2-3 months

Sincerely,

*Julie Hersch MD*

JULIE L HERSCH MD

## PROOF OF SERVICE/CERTIFICATE OF SERVICE

*Davidson v ALCATEL-LUCENT USA, INC., et al.,*
Alameda Case No. RG16825351

STATE OF CALIFORNIA          )
                                                   ) ss
COUNTY OF LOS ANGELES     )

     I, Brandon DuPree, declare,

     I am employed in the County of Los Angeles, State of California.  I am over the age of 18 years and am not a party to the within action.  My business address is 1880 Century Park East, Suite 700, Los Angeles, California 90067.

On the date executed below, I served the foregoing document(s):

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PREFERENCE IN TRIAL SETTING PURSUANT TO C.C.P § 36(a) and (d); MEMORANDUM OF POINTS AND AUTHORITIES, DECLARATION OF LEONARD SANDOVAL; DECLARATION OF DR. ERIC PRESSER**

**BY FEDERAL EXPRESS**:   I caused the above-referenced envelope to be marked for next-day delivery with the postage thereon fully prepaid to be delivered to an overnight courier service for delivery to the following addressee(s):

### SEE ATTACHED SERVICE LIST

I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

     I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

     Executed on September 23, 2016, in Los Angeles, California.

_____
Brandon DuPree
Paralegal

WEITZ & LUXENBERG P.C.
A PROFESSIONAL CORPORATION
LAW OFFICES
1880 CENTURY PARK EAST, SUITE 700
LOS ANGELES, CALIFORNIA 90067

- 1 -
_____

**PROOF OF SERVICE/CERTIFICATE OF SERVICE**

*Davidson v ALCATEL-LUCENT USA, INC., et al.,*

Alameda Case No. RG16825351

| ALCATEL-LUCENT USA INC., f/k/a Lucent Technologies Inc. as successor in interest to BELL TELEPHONE LABORATORIES, INC. (also known as BELL LABORATORIES, BELL LABS and BTL);<br><br>Riley Safer Holmes & Cancila LLP<br>Meghan R. McMeel<br>Alison Maddeford<br>111 New Montgomery Street, Suite 600<br>San Francisco, CA 94105<br>Telephone: (415) 275-8550<br>Facsimile: (415) 275-8551 | AT&T CORP., individually and as successor in interest to PACIFIC BELL TELEPHONE COMPANY, PACIFIC TELEPHONE & TELEGRAPH COMPANY, BELL TELEPHONE LABORATORIES, INC. (also known as BELL LABORATORIES, BELL LABS and BTL) and WESTERN ELECTRIC COMPANY INC<br><br>Riley Safer Holmes & Cancila LLP<br>Meghan R. McMeel<br>Alison Maddeford<br>111 New Montgomery Street, Suite 600<br>San Francisco, CA 94105<br>Telephone: (415) 275-8550<br>Facsimile: (415) 275-8551 | PACIFIC BELL TELEPHONE COMPANY, individually and as successor in interest to PACIFIC TELEPHONE & TELEGRAPH COMPANY (for asbestos containing products used in telephone industry and as a contractor, and a premises defendant);<br><br>Riley Safer Holmes & Cancila LLP<br>Meghan R. McMeel<br>Alison Maddeford<br>111 New Montgomery Street, Suite 600<br>San Francisco, CA 94105<br>Telephone: (415) 275-8550<br>Facsimile: (415) 275-8551 |
| COORDINATING COUNSEL<br><br>Jay Kleinwaks<br>SPANOS \| PRZETAK<br>A Professional Law Corp.<br>475 14th Street, Suite 550<br>Oakland, CA 94612<br>Telephone: 510-250-0200<br>Facsimile: 510-380-6354 | | |

WEITZ & LUXENBERG P.C.<br>A PROFESSIONAL CORPORATION<br>LAW OFFICES<br>1880 CENTURY PARK EAST, SUITE 700<br>LOS ANGELES, CALIFORNIA 90067

- 2 -

# EXHIBIT B

# Alaska Statehood Act

**(72 Stat. 339) Public Law 85–508, 85th Congress, H. R. 7999, July 7, 1958**

**AN ACT To provide for the admission of the State of Alaska into the Union.**

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That, subject to the provisions of this Act, and upon issuance of the proclamation required by section 8(c) of this Act, the State of Alaska is hereby declared to be a State of the United States of America, is declared admitted into the Union on an equal footing with the other States in all respects whatever, and the constitution formed pursuant to the provisions of the Act of the Territorial Legislature of Alaska entitled, "An Act to provide for the holding of a constitutional convention to prepare a constitution for the State of Alaska; to submit the constitution to the people for adoption or rejection; to prepare for the admission of Alaska as a State; to make an appropriation; and setting an effective date", approved March 19, 1955 (Chapter 46, Session Laws of Alaska, 1955), and adopted by a vote of the people of Alaska in the election held on April 24, 1956, is hereby found to be republican in form and in conformity with the Constitution of the United States and the principles of the Declaration of Independence, and is hereby accepted, ratified, and confirmed.

### Territory

SEC. 2.   The State of Alaska shall consist of all the territory, together with the territorial waters appurtenant thereto, now included in the Territory of Alaska.

### Constitution

SEC. 3.   The constitution of the State of Alaska shall always be republican in form and shall not be repugnant to the Constitution of the United States and the principles of the Declaration of Independence.

### Compact with U.S.

SEC. 4.   As a compact with the United States said State and its people do agree and declare that they forever disclaim all right and title to any lands or other property not granted or confirmed to the State or its political subdivisions by or under the authority of this Act, the right or title to which is held by the United States or is subject to disposition by the United States, and to any lands or other property (including fishing rights), the right or title to which may be held by any Indians, Eskimos, or Aleuts (hereinafter called natives) or is held by the United States in trust for said natives; that all such lands or other property (including fishing rights), the right or title to which may be held by said natives or is held by the United States in trust for said natives, shall be and remain under the absolute jurisdiction and control of the United States until disposed of under its authority, except to such extent as the Congress has prescribed or may hereafter prescribe, and except when held by individual natives in fee without restrictions on alienation: *Provided,* That nothing contained in this Act shall recognize, deny, enlarge, impair, or otherwise affect any claim against the

33

## ALASKA STATEHOOD ACT

United States, and any such claim shall be governed by the laws of the United States applicable thereto; and nothing in this Act is intended or shall be construed as a finding, interpretation, or construction by the Congress that any law applicable thereto authorizes, establishes, recognizes, or confirms the validity or invalidity of any such claim, and the determination of the applicability or effect of any law to any such claim shall be unaffected by anything in this Act: *And provided further*, That no taxes shall be imposed by said State upon any lands or other property now owned or hereafter acquired by the United States or which, as hereinabove set forth, may belong to said natives, except to such extent as the Congress has prescribed or may hereafter prescribe, and except when held by individual natives in fee without restrictions on alienation. (Amended June 25, 1959, P.L. 86-70, § 2(a), 73 Stat. 141.)

### Title to property

Sec. 5. The State of Alaska and its political subdivisions, respectively, shall have and retain title to all property, real and personal, title to which is in the Territory of Alaska or any of the subdivisions. Except as provided in section 6 hereof, the United States shall retain title to all property, real and personal, to which it has title, including public lands.

### Selection from public lands

Sec. 6. (a) For the purposes of furthering the development and expansion of communities, the State of Alaska is hereby granted and shall be entitled to select, within thirty-five years after the date of the admission of the State of Alaska into the Union, from lands within national forests in Alaska which are vacant and unappropriated at the time of their selection not to exceed four hundred thousand acres of land, and from the other public lands of the United States in Alaska which are vacant, unappropriated, and unreserved at the time of their selection not to exceed another four hundred thousand acres of land, all of which shall be adjacent to established communities or suitable for prospective community centers and recreational areas. Such lands shall be selected by the State of Alaska with the approval of the Secretary of Agriculture as to national forest lands and with the approval of the Secretary of the Interior as to other public lands: *Provided*, That nothing herein contained shall affect any valid existing claim, location, or entry under the laws of the United States, whether for homestead, mineral, right-of-way, or other purpose whatsoever, or shall affect the rights of any such owner, claimant, locator, or entryman to the full use and enjoyment of the land so occupied: *Provided further*, That for the purposes of this section the term "public lands of the United States in Alaska which are vacant, unappropriated, and unreserved" shall include, without limiting the use thereof, the retained or reserved interest of the United States in lands which have been disposed of with a reservation to the United States of all minerals or any specified mineral or minerals.

(b) The State of Alaska, in addition to any other grants made in this section, is hereby granted and shall be entitled to select, within thirty-five years after the admission of Alaska into the Union, not to exceed one hundred and two million five hundred and fifty thousand acres from the public lands of the United States

34

## ALASKA STATEHOOD ACT

in Alaska which are vacant, unappropriated, and unreserved at the time of their selection: *Provided*, That nothing herein contained shall affect any valid existing claim, location, or entry under the laws of the United States, whether for homestead, mineral, right-of-way, or other purpose whatsoever, or shall affect the rights of any such owner, claimant, locator, or entryman to the full use and enjoyment of the lands so occupied: *And provided further*, That no selection hereunder shall be made in the area north and west of the line described in section 10 without approval of the President or his designated representative.

(c) Block 32, and the structures and improvements thereon, in the city of Juneau are granted to the State of Alaska for any or all of the following purposes or a combination thereof: A residence for the Governor, a State museum, or park and recreational use.

(d) Block 19, and the structures and improvements thereon, and the interests of the United States in blocks C and 7, and the structures and improvements thereon, in the city of Juneau, are hereby granted to the State of Alaska.

### Fish and wildlife resources

(e) All real and personal property of the United States situated in the Territory of Alaska which is specifically used for the sole purpose of conservation and protection of the fisheries and wildlife of Alaska, under the provisions of the Alaska game law of July 1, 1943 (57 Stat. 301; 48 U.S.C., secs. 192 – 211), as amended, and under the provisions of the Alaska commercial fisheries laws of June 26, 1906 (34 Stat. 478; 48 U.S.C., secs. 230 – 239 and 241 – 242), and June 6, 1924 (43 Stat. 465; 48 U.S.C., secs. 221 – 228), as supplemented and amended, shall be transferred and conveyed to the State of Alaska by the appropriate Federal agency: *Provided*, That the administration and management of the fish and wildlife resources of Alaska shall be retained by the Federal Government under existing laws until the first day of the first calendar year following the expiration of ninety calendar days after the Secretary of the Interior certifies to the Congress that the Alaska State Legislature has made adequate provision for the administration, management, and conservation of said resources in the broad national interest: *Provided*, That such transfer shall not include lands withdrawn or otherwise set apart as refuges or reservations for the protection of wildlife nor facilities utilized in connection therewith, or in connection with general research activities relating to fisheries or wildlife. Sums of money that are available for apportionment or which the Secretary of the Interior shall have apportioned, as of the date the State of Alaska shall be deemed to be admitted into the Union, for wildlife restoration in the Territory of Alaska, pursuant to section (8)(a) of the Act of September 2, 1937, as amended (16 U.S.C., sec. 669g-1), and for fish restoration and management in the Territory of Alaska, pursuant to section 12 of the Act of August 9, 1950 (16 U.S.C., sec. 777k), shall continue to be available for the period, and under the terms and conditions in effect at the time, the apportionments are made. Commencing with the year during which Alaska is admitted into the Union, the Secretary of the Treasury, at the close of each fiscal year, shall pay to the State of Alaska 70 per centum of the net proceeds, as determined by the Secretary of

35

the Interior, derived during such fiscal year from all sales of sealskins or sea-otter skins made in accordance with the provisions of the Fur Seal Act of 1966. In arriving at the net proceeds, there shall be deducted from the receipts from all sales all costs to the United States in carrying out the provisions of the Fur Seal Act of 1966, including, but not limited to, the costs of handling and dressing the skins, the costs of making the sales, and all expenses incurred in the administration of the Pribilof Islands, and the payments made to any municipal corporation established pursuant to section 206 of the Fur Seal Act of 1966 and to the civil service retirement and disability fund pursuant to section 208 of the Fur Seal Act of 1966. In administering the Pribilof Islands fund established by section 407 of the Fur Seal Act of 1966, the Secretary shall consult with the State of Alaska annually. Nothing in this Act shall be construed as affecting the rights of the United States under the provisions of the Fur Seal Act of 1966 and the Northern Pacific Halibut Act of 1937 (16 U.S.C. 772 – 772l).

## Public school support

(f) Five per centum of the proceeds of sale of public lands lying within said State which shall be sold by the United States subsequent to the admission of said State into the Union, after deducting all the expenses incident to such sales, shall be paid to said State to be used for the support of the public schools within said State.

(g) Except as provided in subsection (a), all lands granted in quantity to and authorized to be selected by the State of Alaska by this Act shall be selected in such manner as the laws of the State may provide, and in conformity with such regulations as the Secretary of the Interior may prescribe. All selections shall be made in reasonably compact tracts, taking into account the situation and potential uses of the lands involved, and each tract selected shall contain at least five thousand seven hundred and sixty acres unless isolated from other tracts open to selection or, in the case of selections under subsection (a) of this section, one hundred and sixty acres. The authority to make selections shall never be alienated or bargained away, in whole or in part, by the State. Upon the revocation of any order of withdrawal in Alaska, the order of revocation shall provide for a period of not less than ninety days before the date on which it otherwise becomes effective, if subsequent to the admission of Alaska into the Union, during which period the State of Alaska shall have a preferred right of selection, subject to the requirements of this Act, except as against prior existing valid rights or as against equitable claims subject to allowance and confirmation. Such preferred right of selection shall have precedence over the preferred right of application created by section 4 of the Act of September 27, 1944 (58 Stat. 748; 43 U.S.C., sec. 282), as now or hereafter amended, but not over other preference rights now conferred by law. Where any lands desired by the State are unsurveyed at the time of their selection, the Secretary of the Interior shall survey the exterior boundaries of the area requested without any interior subdivision thereof and shall issue a patent for such selected area in terms of the exterior boundary survey; where any lands desired by the State are surveyed at the time of their selection, the boundaries of the area requested

shall conform to the public land subdivisions established by the approval of the survey. All lands duly selected by the State of Alaska pursuant to this Act shall be patented to the State by the Secretary of the Interior. Following the selection of lands by the State and the tentative approval of such selection by the Secretary of the Interior or his designee, but prior to the issuance of final patent, the State is hereby authorized to execute conditional leases and to make conditional sales of such selected lands. As used in this subsection, the words "equitable claims subject to allowance and confirmation" include, without limitation, claims of holders of permits issued by the Department of Agriculture on lands eliminated from national forests, whose permits have been terminated only because of such elimination and who own valuable improvements on such lands. As to all selections made by the State after January 1, 1979, pursuant to section 6(b) of this Act, the Secretary of the Interior, in his discretion, may waive the minimum tract selection size where he determines that such a reduced selection size would be in the national interest and would result in a better land ownership pattern.

## Mineral leases, permits, etc.

(h) Any lease, permit, license, or contract issued under the Mineral Leasing Act of February 25, 1920 (41 Stat. 437; 30 U.S.C. 181 and the following), as amended, or under the Alaska Coal Leasing Act of October 20, 1914 (38 Stat. 741; 30 U.S.C. 432 and the following), as amended, shall have the effect of withdrawing the lands subject thereto from selection by the State of Alaska under this Act, unless an application to select such lands is filed with the Secretary of the Interior within a period of ten years after the date of the admission of Alaska into the Union. Such selections shall be made only from lands that are otherwise open to selection under this Act. When all of the lands subject to a lease, permit, license, or contract are selected, the patent for the lands so selected shall vest in the State of Alaska all the right, title, and interest of the United States in and to that lease, permit, license, or contract that remains outstanding on the effective date of the patent, including the right to all the rentals, royalties, and other payments accruing after that date under that lease, permit, license, or contract, and including any authority that may have been retained by the United States to modify the terms and conditions of that lease, permit, license, or contract: Provided, That nothing herein contained shall affect the continued validity of any such lease, permit, license, or contract or any rights arising thereunder. Where only a portion of the lands subject to a lease, permit, license, or contract are selected, there shall be reserved to the United States the mineral or minerals subject to that lease, permit, license, or contract, together with such further rights as may be necessary to the full and complete enjoyment of all rights, privileges, and benefits under or with respect to that lease, permit, license, or contract; upon the termination of the lease, permit, license, or contract, title to the minerals so reserved to the United States shall pass to the State of Alaska.

ALASKA STATEHOOD ACT

## Mineral land grants

(i) All grants made or confirmed under this Act shall include mineral deposits. The grants of mineral lands to the State of Alaska under subsections (a) and (b) of this section are made upon the express conditions that all sales, grants, deeds, or patents for any of the mineral lands so granted shall be subject to and contain a reservation to the State of all of the minerals in the lands so sold, granted, deeded, or patented, together with the right to prospect for, mine, and remove the same. Mineral deposits in such lands shall be subject to lease by the State as the State legislature may direct: *Provided*, That any lands or minerals hereafter disposed of contrary to the provisions of this section shall be forfeited to the United States by appropriate proceedings instituted by the Attorney General for that purpose in the United States District Court for the District of Alaska.

## Schools and colleges

(j) The schools and colleges provided for in this Act shall forever remain under the exclusive control of the State, or its governmental subdivisions, and no part of the proceeds arising from the sale or disposal of any lands granted herein for educational purposes shall be used for the support of any sectarian or denominational school, college, or university.

## Confirmation of grants

(k) Grants previously made to the Territory of Alaska are hereby confirmed and transferred to the State of Alaska upon its admission. Effective upon the admission of the State of Alaska into the Union, section 1 of the Act of March 4, 1915 (38 Stat. 1214; 48 U.S.C., sec. 353), as amended, and the last sentence of section 35 of the Act of February 25, 1920 (41 Stat. 450; 30 U.S.C., sec. 191), as amended, are repealed and all lands therein reserved under the provisions of section 1 as of the date of this Act shall, upon the admission of said State into the Union, be granted to said State for the purposes for which they were reserved; but such repeal shall not affect any outstanding lease, permit, license, or contract issued under said section 1, as amended, or any rights or powers with respect to such lease, permit, license, or contract, and shall not affect the disposition of the proceeds or income derived prior to such repeal from any lands reserved under said section 1, as amended, or derived thereafter from any disposition of the reserved lands or an interest therein made prior to such repeal.

## Internal improvements

(l) The grants provided for in this Act shall be in lieu of the grant of land for purposes of internal improvements made to new States by section 8 of the Act of September 4, 1841 (5 Stat. 455), and sections 2378 and 2379 of the Revised Statutes (43 U.S.C., sec. 857), and in lieu of the swampland grant made by the Act of September 28, 1850 (9 Stat. 520), and section 2479 of the Revised Statutes (43 U.S.C., sec. 982), and in lieu of the grant of thirty thousand acres for each Senator and Representative in Congress made by the Act of July 2, 1862, as amended (12 Stat. 503; 7 U.S.C., secs. 301 – 308), which grants are hereby declared not to extend to the State of Alaska.

38

## Submerged lands

(iii) The Submerged Lands Act of 1953 (Public Law 31, Eighty-third Congress, first session; 67 Stat. 29) shall be applicable to the State of Alaska and the said State shall have the same rights as do existing States thereunder.

(n) The minimum tract selection size is waived with respect to a selection made by the State of Alaska under subsection (a) for the following selections:

| National Forest Community Grant Application Number | Area Name | Est. Acres |
| --- | --- | --- |
| 209 | Yakutat Airport Addition | 111 |
| 264 | Bear Valley (Portage) | 120 |
| 284 | Hyder-Fish Creek | 61 |
| 310 | Elfin Cove | 37 |
| 384 | Edna Bay Admin Site | 37 |
| 390 | Point Hilda | 29 |

(o)(1) The State of Alaska may elect to convert a selection filed under subsection (a) to a selection under subsection (a) by notifying the Secretary of the Interior in writing.

(2) If the State of Alaska makes an election under paragraph (1), the entire selection shall be converted to a selection under subsection (a).

(3) The Secretary of the Interior shall not convey a total of more than 400,000 acres of public domain land selected under subsection (a) or converted under paragraph (1) to a public domain selection under subsection (a).

(4) Conversion of a selection under paragraph (1) shall not increase the survey obligation of the United States with respect to the land converted.

(p) All selection applications of the State of Alaska that are on file with the Secretary of the Interior under the public domain provisions of subsection (a) on the date of enactment of this subsection and any selection applications that are converted to a subsection (a) selection under subsection (o)(1) are approved as suitable for community or recreational purposes.

[Amended by P.L. 86-70, § 2(c), 73 Stat. 141, June 25, 1959; P.L. 86-173, 73 Stat. 395, Aug. 18, 1959; P.L. 86-786, § 4, 74 Stat. 1024, Sept. 14, 1960; P.L. 88-135, 77 Stat. 223, Oct. 8, 1963; P.L. 88-289, 78 Stat. 168, March 25, 1964; P.L. 89-702, Title IV, § 408(b), 80 Stat. 1098, Nov. 2, 1966; P.L. 96-487, Title IX, § 906(a), (f)(3), 94 Stat. 2437, Dec. 2, 1980; P.L. 108-452, Title I, § 101, 118 Stat. 3575, Dec. 2, 2004.)

## Certification by President

Sec. 7. Upon enactment of this Act, it shall be the duty of the President of the United States, not later than July 3, 1958, to certify such fact to the Governor of Alaska. Thereupon the Governor, on or after July 3, 1958, and not later than August 1, 1958, shall issue his proclamation for the elections, as hereinafter provided, for officers of all elective offices and in the manner provided for by the constitution of the proposed State of Alaska, but the officers

39

ALASKA STATEHOOD ACT

so elected shall in any event include two Senators and one Representative in Congress.

### Election of officers; date, etc.

Sec. 8. (a) The proclamation of the Governor of Alaska required by section 7 shall provide for holding of a primary election and a general election on dates to be fixed by the Governor of Alaska: *Provided,* That the general election shall not be held later than December 1, 1958, and at such elections the officers required to be elected as provided in section 7 shall be, and officers for other elective offices provided for in the constitution of the proposed State of Alaska may be, chosen by the people. Such elections shall be held, and the qualifications of voters thereat shall be, as prescribed by the constitution of the proposed State of Alaska for the election of members of the proposed State legislature. The returns thereof shall be made and certified in such manner as the constitution of the proposed State of Alaska may prescribe. The Governor of Alaska shall certify the results of said elections to the President of the United States.

(b) At an election designated by proclamation of the Governor of Alaska, which may be the general election held pursuant to subsection (a) of this section, or a Territorial general election, or a special election, there shall be submitted to the electors qualified to vote in said election, for adoption or rejection, by separate ballot on each, the following propositions:

"(1) Shall Alaska immediately be admitted into the Union as a State?

"(2) The boundaries of the State of Alaska shall be as prescribed in the Act of Congress approved .............................. (date of approval of this Act) and all claims of this State to any areas of land or sea outside the boundaries so prescribed are hereby irrevocably relinquished to the United States.

"(3) All provisions of the Act of Congress approved .............................. (date of approval of this Act) reserving rights or powers to the United States, as well as those prescribing the terms or conditions of the grants of lands or other property therein made to the State of Alaska, are consented to fully by said State and its people."

In the event each of the foregoing propositions is adopted at said election by a majority of the legal votes cast on said submission, the proposed constitution of the proposed State of Alaska, ratified by the people at the election held on April 24, 1956, shall be deemed amended accordingly. In the event any one of the foregoing propositions is not adopted at said election by a majority of the legal votes cast on said submission, the provisions of this Act shall thereupon cease to be effective.

### Certification of voting results by Governor

The Governor of Alaska is hereby authorized and directed to take such action as may be necessary or appropriate to insure the submission of said propositions to the people. The return of the votes cast on said proposition shall be made by the election officers directly to the Secretary of Alaska, who shall

certify the results of the submission to the Governor. The Governor shall certify the results of said submission, as so ascertained, to the President of the United States.

### Proclamation by President

(c) If the President shall find that the propositions set forth in the preceding subsection have been duly adopted by the people of Alaska, the President, upon certification of the returns of the election of the officers required to be elected as provided in section 7 of this Act, shall thereupon issue his proclamation announcing the results of said election as so ascertained. Upon the issuance of said proclamation by the President, the State of Alaska shall be deemed admitted into the Union as provided in section 1 of this Act.

Until the said State is so admitted into the Union, all of the officers of said Territory, including the Delegate in Congress from said Territory, shall continue to discharge the duties of their respective offices. Upon the issuance of said proclamation by the President of the United States and the admission of the State of Alaska into the Union, the officers elected at said election, and qualified under the provisions of the constitution and laws of said State, shall proceed to exercise all the functions pertaining to their offices in or under or by authority of the government of said State, and officers not required to be elected at said initial election shall be selected or continued in office as provided by the constitution and laws of said State. The Governor of said State shall certify the election of the Senators and Representative in the manner required by law, and the said Senators and Representative shall be entitled to be admitted to seats in Congress and to all the rights and privileges of Senators and Representatives of other States in the Congress of the United States.

### Laws in effect

(d) Upon admission of the State of Alaska into the Union as herein provided, all of the Territorial laws then in force in the Territory of Alaska shall be and continue in full force and effect throughout said State except as modified or changed by this Act, or by the constitution of the State, or as thereafter modified or changed by the legislature of the State. All of the laws of the United States shall have the same force and effect within said State as elsewhere within the United States. As used in this paragraph, the term "Territorial laws" includes (in addition to laws enacted by the Territorial Legislature of Alaska) all laws or parts thereof enacted by the Congress the validity of which is dependent solely upon the authority of the Congress to provide for the government of Alaska prior to the admission of the State of Alaska into the Union, and the term "laws of the United States" includes all laws or parts thereof enacted by the Congress that (1) apply to or within Alaska at the time of the admission of the State of Alaska into the Union, (2) are not "Territorial laws" as defined in this paragraph, and (3) are not in conflict with any other provisions of this Act.

ALASKA STATEHOOD ACT

## House of Representatives Membership

Sec. 9.   The State of Alaska upon its admission into the Union shall be entitled to one Representative until the taking effect of the next reapportionment, and such representative shall be in addition to the membership of the House of Representatives as now prescribed by law: *Provided*, That such temporary increase in the permanent membership of the House of Representatives shall not operate to either increase or decrease the permanent membership of the House of Representatives as prescribed in the Act of August 8, 1911 (37 Stat. 13) nor shall such temporary increase affect the basis of apportionment established by the Act of November 15, 1941 (55 Stat. 761; 2 U.S.C., sec. 2a), for the Eighty-third Congress and each Congress thereafter.

## National Defense Withdrawals

Sec. 10.   (a) The President of the United States is hereby authorized to establish, by Executive order or proclamation, one or more special national defense withdrawals within the exterior boundaries of Alaska, which withdrawal or withdrawals may thereafter be terminated in whole or in part by the President.

(b) Special national defense withdrawals established under subsection (a) of this section shall be confined to those portions of Alaska that are situated to the north or west of the following line: Beginning at the point where the Porcupine River crosses the international boundary between Alaska and Canada; thence along a line parallel to, and five miles from, the right bank of the main channel of the Porcupine River to its confluence with the Yukon River; thence along a line parallel to, and five miles from, the right bank of the main channel of the Yukon River to its most southerly point of intersection with the meridian of longitude 160 degrees west of Greenwich; thence south to the intersection of said meridian with the Kuskokwim River; thence along a line parallel to, and five miles from the right bank of the Kuskokwim River to the mouth of said river; thence along the shoreline of Kuskokwim Bay to its intersection with the meridian of longitude 162 degrees 30 minutes west of Greenwich; thence south to the intersection of said meridian with the parallel of latitude 57 degrees 30 minutes north; thence east to the intersection of said parallel with the meridian of longitude 156 degrees west of Greenwich; thence south to the intersection of said meridian with the parallel of latitude 50 degrees north.

## Jurisdiction

(c) Effective upon the issuance of such Executive order or proclamation, exclusive jurisdiction over all special national defense withdrawals established under this section is hereby reserved to the United States, which shall have sole legislative, judicial, and executive power within such withdrawals, except as provided hereinafter.  The exclusive jurisdiction so established shall extend to all lands within the exterior boundaries of each such withdrawal, and shall remain in effect with respect to any particular tract or parcel of land only so long as such tract or parcel remains within the exterior boundaries of such a withdrawal.  The laws of the State of Alaska shall not apply to areas within any special national defense withdrawal established under this section while such areas remain subject to the exclusive jurisdiction hereby authorized: *Provided,*

42

however, That such exclusive jurisdiction shall not prevent the execution of any process, civil or criminal, of the State of Alaska, upon any person found within said withdrawals: *And provided further*, That such exclusive jurisdiction shall not prohibit the State of Alaska from enacting and enforcing all laws necessary to establish voting districts, and the qualification and procedures for voting in all elections.

(d) During the continuance in effect of any special national defense withdrawal established under this section, or until the Congress otherwise provides, such exclusive jurisdiction shall be exercised within each such withdrawal in accordance with the following provisions of law:

(1) All laws enacted by the Congress that are of general application to areas under the exclusive jurisdiction of the United States, including, but without limiting the generality of the foregoing, those provisions of title 18, United States Code, that are applicable within the special maritime and territorial jurisdiction of the United States as defined in section 7 of said title, shall apply to all areas within such withdrawals.

(2) In addition, any areas within the withdrawals that are reserved by Act of Congress or by Executive action for a particular military or civilian use of the United States shall be subject to all laws enacted by the Congress that have application to lands withdrawn for that particular use, and any other areas within the withdrawals shall be subject to all laws enacted by the Congress that are of general application to lands withdrawn for defense purposes of the United States.

(3) To the extent consistent with the laws described in paragraphs (1) and (2) of this subsection and with regulations made or other actions taken under their authority, all laws in force within such withdrawals immediately prior to the creation thereof by Executive order or proclamation shall apply within the withdrawals and, for this purpose, are adopted as laws of the United States: *Provided, however*, That the laws of the State or Territory relating to the organization or powers of municipalities or local political subdivisions, and the laws or ordinances of such municipalities or political subdivisions shall not be adopted as laws of the United States.

(4) All functions vested in the United States commissioners by the laws described in this subsection shall continue to be performed within the withdrawals by such commissioners.

(5) All functions vested in any municipal corporation, school district, or other local political subdivision by the laws described in this subsection shall continue to be performed within the withdrawals by such corporation, district, or other subdivision, and the laws of the state or the laws or ordinances of such municipalities or political subdivision shall remain in full force and effect notwithstanding any withdrawal made under this section.

(6) All other functions vested in the government of Alaska or in any officer or agency thereof, except judicial functions over which the United States District Court for the District of Alaska is given jurisdiction by this Act or other provisions of law, shall be performed within the withdrawals by such

43

civilian individuals or civilian agencies and in such manner as the President shall from time to time, by Executive order, direct or authorize.

(7) The United States District Court for the District of Alaska shall have original jurisdiction, without regard to the sum or value of any matter in controversy, over all civil actions arising within such withdrawals under the laws made applicable thereto by this subsection, as well as over all offenses committed within the withdrawals.

(e) Nothing contained in subsection (d) of this section shall be construed as limiting the exclusive jurisdiction established in the United States by subsection (c) of this section or the authority of the Congress to implement such exclusive jurisdiction by appropriate legislation, or as denying to persons now or hereafter residing within any portion of the areas described in subsection (b) of this section the right to vote at all elections held within the political subdivisions as prescribed by the State of Alaska where they respectively reside, or as limiting the jurisdiction conferred on the United States District Court for the District of Alaska by any other provision of law, or as continuing in effect laws relating to the Legislature of the Territory of Alaska. Nothing contained in this section shall be construed as limiting any authority otherwise vested in the Congress or the President.

### Mount McKinley National Park

Sec. 11. (a) Nothing in this Act shall affect the establishment, or the right, ownership, and authority of the United States in Mount McKinley National Park, as now or hereafter constituted; but exclusive jurisdiction, in all cases, shall be exercised by the United States for the national park, as now or hereafter constituted; saving, however, to the State of Alaska the right to serve civil or criminal process within the limits of the aforesaid park in suits or prosecutions for or on account of rights acquired, obligations incurred, or crimes committed in said State, but outside of said park; and saving further to the said State the right to tax persons and corporations, their franchises and property on the lands included in said park; and saving also to the persons residing now or hereafter in such area the right to vote at all elections held within the respective political subdivisions of their residence in which the park is situated.

### Military, naval, etc., lands; civil and criminal jurisdiction

(b) Notwithstanding the admission of the State of Alaska into the Union, authority is reserved in the United States, subject to the proviso hereinafter set forth, for the exercise by the Congress of the, United States of the power of exclusive legislation, as provided by article I, section 8, clause 17, of the Constitution of the United States, in all cases whatsoever over such tracts or parcels or land as, immediately prior to the admission of said State, are owned by the United States and held for military, naval, Air Force, or Coast Guard purposes, including naval petroleum reserve numbered 4, whether such lands were acquired by cession and transfer to the United States by Russia and set aside by Act of Congress or by Executive order or proclamation of the President or the Governor of Alaska for the use of the United States, or were acquired by

---

the United States by purchase, condemnation, donation, exchange, or otherwise: Provided, (i) That the State of Alaska shall always have the right to serve civil or criminal process within the said tracts or parcels of land in suits or prosecutions for or on account of rights acquired, obligations incurred, or crimes committed within the said State but outside of the said tracts or parcels of land; (ii) that the reservation of authority in the United States of the power of exclusive exercise by the Congress of the United States of the power of exclusive legislation over the lands aforesaid shall not operate to prevent such lands from being a part of the State of Alaska, or to prevent the said State from exercising over or upon such lands, concurrently with the United States, any jurisdiction whatsoever which it would have in the absence of such reservation of authority whatsoever which it would have in the absence of such reservation of authority and which is consistent with the laws hereafter enacted by the Congress pursuant to such reservation of authority; and (iii) that such power of exclusive legislation shall rest and remain in the United States only so long as the particular tract or parcel of land involved is owned by the United States and used for military, naval, Air Force, or Coast Guard purposes. The provisions of this subsection shall not apply to lands within such special national defense withdrawal or withdrawals as may be established pursuant to section 10 of this Act until such lands cease to be subject to the exclusive jurisdiction reserved to the United States by that section.

### Judicial and Criminal Provisions

Sec. 12. Effective upon the admission of Alaska into the Union—

(a) The analysis of chapter 5 of title 28, United States Code, immediately preceding section 81 of such title, is amended by inserting immediately after and underneath item 81 of such analysis, a new item to be designated as item 81A and to read as follows: "81A. Alaska";

(b) Title 28, United States Code, is amended by inserting immediately after section 81 thereof a new section, to be designated as section 81A, and to read as follows:

"§ 81A. Alaska

"Alaska constitutes one judicial district.

"Court shall be held at Anchorage, Fairbanks, Juneau, and Nome.";

(c) Section 133 of title 28, United States Code, is amended by inserting in the table of districts and judges in such section immediately above the item: 'Arizona * * * 2', a new item as follows: 'Alaska * * * 1';

(d) The first paragraph of section 373 of title 28, United States Code, as heretofore amended, is further amended by striking out the words: "the District Court for the Territory of Alaska,": Provided, That the amendment made by this subsection shall not affect the rights of any judge who may have retired before it takes effect;

(e) The words "the District Court for the Territory of Alaska," are stricken out wherever they appear in sections 333, 460, 610, 753, 1252, 1291, 1292, and 1346 of title 28, United States Code;

ALASKA STATEHOOD ACT

(f) The first paragraph of section 1252 of title 28, United States Code, is further amended by striking out the word "Alaska," from the clause relating to courts of record;

(g) Subsection (2) of section 1294 of title 28, United States Code, is repealed and the later subsections of such section are renumbered accordingly;

(h) Subsection (a) of section 2410 of title 28, United States Code, is amended by striking out the words: "including the District Court for the Territory of Alaska,";

(i) Section 3241 of title 18, United States Code, is amended by striking out the words: "District Court for the Territory of Alaska, the";

(j) Subsection (e) of section 3401 of title 18, United States Code, is amended by striking out the words: "for Alaska or";

(k) Section 3771 of title 18, United States Code, as heretofore amended, is further amended by striking out from the first paragraph of such section the words: "the Territory of Alaska,";

(l) Section 3772 of title 18, United States Code, as heretofore amended, is further amended by striking out from the first paragraph of such section the words: "the Territory of Alaska,";

(m) Section 2072 of title 28, United States Code, as heretofore amended, is further amended by striking out from the first paragraph of such section the words: "and of the District Court for the Territory of Alaska";

(n) Subsection (q) of section 376 of title 28, United States Code, is amended by striking out the words: "the District Court for the Territory of Alaska,": Provided, That the amendment made by this subsection shall not affect the rights under such section 376 of any present or former judge of the District Court for the Territory of Alaska or his survivors;

(o) The last paragraph of section 1963 of title 28, United States Code, is repealed;

(p) Section 2201 of title 28, United States Code, is amended by striking out the words: "and the District Court for the Territory of Alaska"; and

(q) Section 4 of the Act of July 28, 1950 (64 Stat. 380; 5 U.S.C., sec. 341b) is amended by striking out the word: "Alaska".

### Continuation of suits

Sec. 13. No writ, action, indictment, cause, or proceeding pending in the District Court for the Territory of Alaska on the date when said Territory shall become a State, and no case pending in an appellate court upon appeal from the District Court for the Territory of Alaska at the time said Territory shall become a State, shall abate by the admission of the State of Alaska into the Union, but the same shall be transferred and proceeded with as hereinafter provided.

All civil causes of action and all criminal offenses which shall have arisen or been committed prior to the admission of said State, but as to which no suit,

action, or prosecution shall be pending at the date of such admission, shall be subject to prosecution in the appropriate State courts or in the United States District Court for the District of Alaska in like manner, to the same extent, and with like right of appellate review, as if said State had been created and said courts had been established prior to the accrual of said causes of action or the commission of such offenses; and such of said criminal offenses as shall have been committed against the laws of the Territory shall be tried and punished by the appropriate courts of said State, and such as shall have been committed against the laws of the United States shall be tried and punished in the United States District Court for the District of Alaska.

### Appeals

Sec. 14. Appeals. All appeals taken from the District Court for the Territory of Alaska to the Supreme Court of the United States or the United States Court of Appeals for the Ninth Circuit, previous to the admission of Alaska as a State, shall be prosecuted to final determination as though this Act had not been passed. All cases in which final judgment has been rendered in such district court, and in which appeals might be had except for the admission of such State, may still be sued out, taken, and prosecuted to the Supreme Court of the United States or the United States Court of Appeals for the Ninth Circuit under the provisions of then existing law, and there held and determined in like manner; and in either case, the Supreme Court of the United States, or the United States Court of Appeals, in the event of reversal, shall remand the said cause to either the State supreme court or other final appellate court of said State, or the United States district court for said district, as the case may require: Provided, That the time allowed by existing law for appeals from the district court for said Territory shall not be enlarged thereby.

### Transfer of cases

Sec. 15. All causes pending or determined in the District Court for the Territory of Alaska at the time of the admission of Alaska as a State which are of such nature as to be within the jurisdiction of a district court of the United States shall be transferred to the United States District Court for the District of Alaska for final disposition and enforcement in the same manner as is now provided by law with reference to the judgments and decree in existing United States district courts. All other causes pending or determined in the District Court for the Territory of Alaska at the time of the admission of Alaska as a State shall be transferred to the appropriate State court of Alaska. All final judgments and decrees rendered upon such transferred cases in the United States District Court for the District of Alaska may be reviewed by the Supreme Court of the United States or by the United States Court of Appeals for the Ninth Circuit in the same manner as is now provided by law with reference to the judgments and decrees in existing United States district courts.

### Succession of courts

Sec. 16. Jurisdiction of all cases pending or determined in the District Court for the Territory of Alaska not transferred to the United States District Court for

# ALASKA STATEHOOD ACT

the District of Alaska shall devolve upon and be exercised by the courts of original jurisdiction created by said State, which shall be deemed to be the successor of the District Court for the Territory of Alaska with respect to cases not so transferred and, as such, shall take and retain custody of all records, dockets, journals, and files of such court pertaining to such cases. The files and papers in all cases so transferred to the United States district court, together with a transcript of all book entries to complete the record in such particular cases so transferred, shall be in like manner transferred to said district court.

Sec. 17. All cases pending in the District Court for the Territory of Alaska at the time said Territory becomes a State not transferred to the United States District Court for the District of Alaska shall be proceeded with and determined by the courts created by said State, with the right to prosecute appeals to the appellate courts created by said State, and also with the same right to prosecute appeals or writs of certiorari from the final determination in said causes made by the court of last resort created by such State to the Supreme Court of the United States, as now provided by law for appeals and writs of certiorari from the court of last resort of a State to the Supreme Court of the United States.

## Jurisdiction of District Court; Termination date

Sec. 18. The provisions of the preceding sections with respect to the termination of the jurisdiction of the District Court for the Territory of Alaska, the continuation of suits, the succession of courts, and the satisfaction of rights of litigants in suits before such courts, shall not be effective until three years after the effective date of this Act, unless the President, by Executive order, shall sooner proclaim that the United States District Court for the District of Alaska, established in accordance with the provisions of this Act, is prepared to assume the functions imposed upon it. During such period of three years or until such Executive order is issued, the United States District Court for the Territory of Alaska shall continue to function as heretofore. The tenure of the judges, the United States attorneys, marshals, and other officers of the United States District Court for the Territory of Alaska shall terminate at such time as that court shall cease to function as provided in this section.

## Federal Reserve System

Sec. 19. The first paragraph of section 2 of the Federal Reserve Act (38 Stat. 251) is amended by striking out the last sentence thereof and in inserting in lieu of such sentence the following: "When the State of Alaska is hereafter admitted to the Union the Federal Reserve districts shall be readjusted by the Board of Governors of the Federal Reserve System in such manner as to include such State. Every national bank in any State shall, upon commencing business or within ninety days after admission into the Union of the State in which it is located, become a member bank of the Federal Reserve System by subscribing and paying for stock in the Federal Reserve bank of its district in accordance with the provisions of this Act and shall thereupon be an insured bank under the Federal Deposit Insurance Act, and failure to do so shall subject such bank to the penalty provided by the sixth paragraph of this section."

# ALASKA STATEHOOD ACT

## Repeal

Sec. 20. Section 2 of the Act of October 20, 1914 (38 Stat. 742; 48 U.S.C., sec. 433), is hereby repealed.

Sec. 21. Immigration and nationality. Nothing contained in this Act shall operate to confer United States nationality, nor to terminate nationality heretofore lawfully acquired, nor restore nationality heretofore lost under any law of the United States or under any treaty to which the United States may have been a party.

Sec. 22. Section 101(a)(36) of the Immigration and Nationality Act (66 Stat. 170; 8 U.S.C., sec. 1101(a)(36)) is amended by deleting the word "Alaska,".

Sec. 23. The first sentence of section 212(d)(7) of the Immigration and Nationality Act (66 Stat. 188, 8 U.S.C., sec. 1182(d)(7)) is amended by deleting the word "Alaska,".

Sec. 24. Nothing contained in this Act shall be held to repeal, amend, or modify the provisions of section 304 of the Immigration and Nationality Act (66 Stat. 237, 8 U.S.C., sec. 1404).

Sec. 25. The first sentence of section 310(a) of the Immigration and Nationality Act (66 Stat. 239, 8 U.S.C., sec. 142(a)) is amended by deleting the words "District Courts of the United States for the Territories of Hawaii and Alaska" and substituting therefor the words "District Court of the United States for the Territory of Hawaii".

Sec. 26. Section 344(d) of the Immigration and Nationality Act (66 Stat. 265, 8 U.S.C., sec. 1455(d)) is amended by deleting the words "in Alaska and".

## Transportation by Water

Sec. 27. (a) The third proviso in section 27 of the Merchant Marine Act, 1920, as amended (46 U.S.C., sec. 883), is further amended by striking out the word "excluding" and inserting in lieu thereof the word "including".

(b) Nothing contained in this or any other Act shall be construed as depriving the Federal Maritime Board of the exclusive jurisdiction heretofore conferred on it over common carriers engaged in transportation by water between any port in the State of Alaska and other ports in the United States, its Territories or possessions, or as conferring upon the Interstate Commerce Commission jurisdiction over transportation by water between any such ports.

## Mines and Mining

Sec. 28. (a) The last sentence of section 9 of the Act entitled "An Act to provide for the leasing of coal lands in the Territory of Alaska, and for other purposes", approved October 20, 1914 (48 U.S.C. 439), is hereby amended to read as follows: "All net profits from operation of Government mines, and all bonuses, royalties, and rentals under leases as herein provided and all other payments received under this Act shall be distributed as follows as soon as practicable after December 31 and June 30 of each year: (1) 90 per centum thereof shall be paid by the Secretary of the Treasury to the State of Alaska for

Note 3

# ALASKA STATEHOOD ACT

disposition by the legislature thereof; and (2) 10 per centum shall be deposited in the Treasury of the United States to the credit of miscellaneous receipts."

(b) Section 35 of the Act entitled "An Act to promote the mining of coal, phosphate, oil, oil shale, gas, and sodium on the public domain", approved February 25, 1920, as amended (30 U.S.C. 191), is hereby amended by inserting immediately before the colon preceding the first proviso thereof the following: ", and of those from Alaska 52½ per centum thereof shall be paid to the State of Alaska for disposition by the legislature thereof"

## Separability Clause

Sec. 29. If any provision of this Act, or any section, subsection, sentence, clause, phrase, or individual word, or the application thereof to any person or circumstance is held invalid, the validity of the remainder of the Act and of the application of any such provision, section, subsection, sentence, clause, phrase, or individual word to other persons and circumstances shall not be affected thereby.

## Repeals

Sec. 30. All Acts or parts of Acts in conflict with the provisions of this Act, whether passed by the legislature of said Territory or by Congress, are hereby repealed.

## Notes of Decisions

Aboriginal lands, generally, aboriginal rights 23
Aboriginal rights 22-26
  In general 10
  Aboriginal lands, generally 23
  Hunting and fishing 25
  Submerged lands 24
  Taxation 26
Appeals, courts and judiciary 33
Continuation of actions, courts and judiciary 27
Courts and judiciary 27-33
  Appeals 33
  Continuation of actions 27
  Federal courts and jurisdiction 32
  Interim courts 31
  Judicial jurisdiction 28
  Territorial courts 29
  Transition 30
Elections 6
Federal courts and jurisdiction, courts and judiciary 32
Federal enactments and regulatory powers 8
Fixtures and improvements 21
Hunting and fishing, aboriginal rights 25
Hunting and fishing, generally 19
Improvements, fixtures and improvements 21
Interim jurisdiction 28
Internal waters, waters and watercourses 14
Judicial jurisdiction, courts and judiciary 28
Lawyers 9

Mineral leases, generally, mining and mineral rights 12
Mining and mineral rights 10-13
  In general 10
  Mineral leases, generally 12
  Oil and gas leases 13
  Reservation of rights 11
National forests 20
Oil and gas leases, mining and mineral rights 13
Purposes 1
Purposes for selection of lands provisions 4
Reservation of rights, mining and mineral rights 11
Riverbeds, waters and watercourses 15
Rivers and navigable waters, submerged lands 17
Roads and highways 7
School lands 5
Selection of lands 3, 4
  In general 3
  Purposes for selection of lands provisions 4
Sovereign immunity 2
Submerged lands 16-17, 24
  In general 16
  Aboriginal lands 24
  Rivers and navigable waters 17
Taxation, aboriginal rights 26
Territorial courts, courts and judiciary 29
Transition, courts and judiciary 30

Transportation by water 18
Waters and watercourses 14, 15
  Internal waters 14
  Riverbeds 15

### 1. Purposes

Purpose of Alaska Statehood Act was to insure that the new state would be economically viable. Alaska Statehood Act, § 1 et seq., 48 U.S.C.A. preceding section 21. U.S. v. Atlantic Richfield Co., 435 F.Supp. 1009. D.Alaska,1977. States § 8.1

### 2. Sovereign immunity

Alaska did not waive its Eleventh Amendment immunity to being sued in federal court when it agreed to terms and conditions of section of the Alaska Statehood Act, whereby state disclaimed all rights and title to lands or other property held by any Indians, Eskimos, or Aleuts or held by the United States in trust for said natives. Native Village of Tyonek v. Puckett, 957 F.2d 631, C.A.9 (Alaska) 1992. Federal Courts 266.1.

By adopting section of Alaska Statehood Act, 48 U.S.C.A. prec. § 21, which recognized paramount interest in certain lands in Alaska natives through control of United States as trustee and paramount interest in other lands in United States for itself, Alaska did not waive bar of this amendment in disputes over land selected for allotment by Alaska natives, even if complaint sufficiently alleged acts which would have overcome common-law doctrine of sovereign immunity—even though such immunity did not exist for Alaska natives, or tribe of Alaska natives could have brought suit against state. Aguilar v. Kleppe, D.C.Alaska 1976, 424 F.Supp. 433. Federal Courts 319

### 3. Selection of lands—In general

Native village corporation created under Alaska Native Claims Settlement Act was entitled to select for ownership lands that the state of Alaska had selected earlier pursuant to the Alaska Mental Health Enabling Act, as land "selected by...but not yet patented" to the state; entitled to, the state under the Alaska Statehood Act", because Alaska was authorized to make its initial selection of the disputed lands only because the Statehood Act confirmed that power, the lands were selected by the state under the Statehood Act. Seldovia Native Ass'n, Inc. v. Lujan, C.A.9(Alaska) 1988, 836 F.2d 1237. Indians 13(2) Indians 171

Forest Service's interpretation of Alaska Statehood Act section authorizing state to select up to 400,000 acres of land from national forests, with approval of Secretary of Agriculture, as requiring that land granted be within 25 nautical miles of existing communities and suitable for prospective community centers was reasonable. Alaska Statehood Act, § 6(a), 48 U.S.C.A., note prec. § 21. State of Alaska v. Lyng, 797 F.2d 1479. C.A.9.Alaska,1986. Public Lands 62

Possibility that the State of Alaska at some later time might, under the Alaska Statehood Act, seek to have land patented to it that would otherwise be claimed by villages under the Alaska Native Claims Settlement Act was sufficient to confer standing on the state as party aggrieved to appeal to the Secretary of Interior from determinations of the Bureau of Indian Affairs that such villages were eligible for selection of land under the latter Act, and the Secretary's permitting the state to appeal in such case was a plainly erroneous interpretation of the applicable regulations. Alaska Native Claims Settlement Act, § 2 et seq., 43 U.S.C.A. § 1601 et seq.; Alaska Statehood Act, §§ 1 et seq., 6(a), 8, 48 U.S.C.A. preceding section 21. Koniag, Inc., Village of Uyak v. Andrus, 580 F.2d 601, Id., 439 U.S. 1052, 99 S.Ct. 733, 58 L.Ed.2d 713, Morton v. Ruckelshaus, D.C.Cir. 1978, Village of Uyak v. Andrus, 580 F.2d 601. Id., 439 U.S. 1052, 99 S.Ct. 733, 58 L.Ed.2d 713. United States 105

Judgment disclaimer in the Alaska Statehood Act of all rights to lands held by natives or by the United States in trust for natives barred state from challenging the Alaska Native Claims Settlement Act. It did not bar state from attempting to show that a given village did not meet the threshold requirements for selection of land under the latter Act. Alaska Native Claims Settlement Act, § 2 et seq., 43 U.S.C.A. § 1601 et seq.; Alaska Statehood Act, §§ 1 et seq., 6(a, b), 48 U.S.C.A. preceding section 21.; Koniag, Inc., Village of Uyak v. Andrus, 580 F.2d 601. C.A. 1978. United States 105

Genuine issues of material fact existed as to whether lands selected by state pursuant to Statehood Act were vacant, unappropriated and unreserved lands, precluding summary judgment. Fed.Rules Civ.Proc.rule 56, 28 U.S.C.A.; Alaska Statehood Act, § 6(b), 48 U.S.C.A. preceding section 21. Koniag, Inc. v. Andrus, 580 F.2d 601. C.A.9, Alaska,1970.

ALASKA STATEHOOD ACT

**Note 3**

plication and claims subsequently filed by individuals to land covered by original application were properly rejected. Alaska Statehood Act, §§ 6(b, g), 48 U.S.C.A. following § 3. Udall v. Kalerak, 396 F.2d 746. C.A.9.Alaska,1968. Public Lands ⚖ 62

Where individual claimants had notice of Alaska's claim to lands which individual sought to claim, Secretary of Interior did not abuse his discretion in accepting Alaska's request to amend original application as a timely reassertion of original claim for lands which had not at time lands had been withdrawn. Alaska Statehood Act, § 6(b, g), 48 U.S.C.A. following § 3. Udall v. Kalerak, 396 F.2d 746. C.A.9.Alaska,1968. Public Lands ⚖ 62

Where selection of government land was made in name of state and in so far as record showed claims made by state conformed to conveyance or other transaction, there was no showing of a violation of prohibition against state's alienation of selected land. Alaska Statehood Act, § 6(g), 48 U.S.C.A. following § 3. Udall v. Kalerak, 396 F.2d 746. C.A.9.Alaska,1968. Public Lands ⚖ 62

Native village corporations selected under Alaska Native Claims Settlement Act [43 U.S.C.A. §§ 1601-1629a] were not entitled to select for ownership lands that state of Alaska had previously selected under authority of Mental Health Enabling Act [70 Stat. 709], but which, although "tentatively proved" had not yet been patented to the state. Alaska Native Claims Settlement Act, §§ 2-35, 3(e), (e)(2), 11(a), (a)(1), 12(a), 12(b), (a)(1), as amended, 43 U.S.C.A. §§ 1601-1629a, 1602(a), 1602(b), 1611(b), (a)(1), 202, 70 Stat. 709; Alaska Statehood Act, §§ 1 et seq., 6(a, b, k), 48 U.S.C.A. note prec. § 48. Tyonek Native Corp. v. Secretary of Interior of U.S., 629 F.Supp. 554. D.Alaska,1986. Indians ⚖ 32

Provision of Alaska Native Claims Settlement Act that prior conveyances of public land pursuant to federal law as well as tentative approvals pursuant to Statehood Act are to be regarded as an extinguishment of any aboriginal title thereto reciprocally extinguished aboriginal title as of date of prior conveyance or tentative approval of state land selections under Statehood Act and did not merely validate prior federal conveyances and tentative land selection approvals as of effective date of Settlement Act; also, Act extinguished all remaining aboriginal title and native claims ... Alaska Native Claims Settlement Act, §§ 2 et seq., 4(a, b), 43 U.S.C.A. §§ 1601 et seq., 1603(a, b); Alaska Statehood Act, § 1 et seq., 48 U.S.C.A. preceding section 21. U.S. v. Atlantic Richfield Co., 435 F.Supp. 1009. D.Alaska,1977. Public Lands ⚖ 3

Provision of Alaska Native Claims Settlement Act extinguishing all claims against the Government and others that are based on claims of aboriginal title extinguishes trespass claims based on aboriginal title and is not limited to claims for compensation for taking of Indian land; hence, provision extinguished native claims against State of Alaska and private parties for trespass on aboriginal title lands prior to passage of Settlement Act, specifically, alleged trespass as to lands tentatively approved to the state pursuant to Statehood Act or conveyed pursuant to federal law, encompassed leases of North Slope oil lands which the state had tentatively selected under the Statehood Act. Alaska Native Claims Settlement Act, § 4(a, c), 43 U.S.C.A. § 1603(a, c); Alaska Statehood Act § 6(b), 48 U.S.C.A. preceding section 21. U.S. v. Atlantic Richfield Co., 435 F.Supp. 1009. D.Alaska,1977. Indians ⚖ 171; Indians ⚖ 199

Shore Space Restoration Order of 1935 waiving, as regards land patented thereunder, the land's classification as United States Survey No. 2136," the statutory prohibition on any homestead extending more than 160 rods along a navigable body of water was insufficient to establish that homestead covered by subject survey was located on shoreline, so as to entitle homesteader to accreted land, in view of contrary evidence that survey line paralleling the channel was a true, rather than the meander line; hence, the State of Alaska was entitled to select the accreted lands pursuant to the Alaska Statehood Act. Alaska Statehood Act, § 11 et seq., § 21, Trustees for Alaska v. State, 736 P.2d 324. Alaska,1987. Public Lands ⚖ 142.2

43 U.S.C.A. §§ 851 and 852 do not grant the state any rights to make in-lieu selections beyond those confirmed in Section 6(b) of the Statehood Act. Alaska Op.Atty.Gen. 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, (July 22, 1992) 1992 WL 564939. Public Lands ⚖ 142.2

**4. Selection for public land provisions**

Forest Service's interpretation of Alaska Statehood Act to be regarded as not acting to select up to 400,000 acres of land from national forests, with approval of Secretary of Agriculture, as having community nexus was reasonable given stated purpose that land grants were for purpose of furthering development of and expansion of communities, Alaska Statehood Act, § 6(a), 48 U.S.C.A. note prec. § 21. State of Alaska v. Lyng, 797 F.2d 1479. C.A.9.Alaska,1986. Public Lands ⚖ 62

Specific purpose of Alaska Statehood Act section authorizing state to select up to 400,000 acres of land from national forests, with approval of Secretary of Agriculture, under which land grants were for purpose of furthering develop-

ment of and expansion of communities overrides general purposes of Act of developing state's economy and decreasing amount of federally owned land. Alaska Statehood Act, § 6(a), 48 U.S.C.A. note prec. § 21. State of Alaska v. Lyng, 797 F.2d 1479. C.A.9.Alaska,1986. Public Lands ⚖ 62

It was not unreasonable to require Alaska to show some expectancy that land would be used for community development and expansion for purposes of Alaska Statehood Act section authorizing Alaska to select up to 400,000 acres of land from national forests, in support of its selection of lands which the state had tentatively selected under the Statehood Act. Alaska Statehood Act, § 6(a), 48 U.S.C.A. note prec. § 21. State of Alaska v. Lyng, 797 F.2d 1479. C.A.9.Alaska,1986. Public Lands ⚖ 62

Purpose of land grants under Alaska Statehood Act, 48 U.S.C.A. § 21 note, is to serve Alaska's overall economic and social well-being as having a ... to protect domestic water supply of most populous area of state did not deprive individuals who also sought such such kind of equal protection of the laws. Udall v. Kalerak, C.A.9 (Alaska) 1968, 396 F.2d 746, certiorari denied 89 S.Ct. 990, 393 U.S. 1118, 22 L.Ed.2d 123. Constitutional Law ⚖ 3020; Public Lands ⚖ 62

Primary purpose of grant of right to Alaska to select 103,350,000 acres of land from United States under Alaska Statehood Act was to ensure economic and social well-being of new state. Udall v. Kalerak, C.A.9 (Alaska) 1968, 396 F.2d 746, certiorari denied 89 S.Ct. 990, 393 U.S. 1118, 22 L.Ed.2d 123. Public Lands ⚖ 62

**5. School lands**

Under grant of lands under Alaska Statehood Act expressly made by people of Alaska as terms and conditions of the federal act, there was created a trust of school lands. Act July 7, 1958, § 6(k), 72 Stat. 343; Const. art. 12, § 13. Western Airlines v. State Dept. of Highways, 562 P.2d 1042. Alaska,1977. Public Lands ⚖ 142.2

**6. Elections**

That the people of Alaska voted in favor of proposition requiring consent by State and its people to provisions of Alaska Statehood Act reserving rights and powers to United States, as well as those prescribing terms or conditions of grants of lands or property therein made to State of Alaska, did not mean that Alaska Constitution was thereby amended to include terms or conditions of grants of land set forth in Alaska Statehood Act existing at time of consent by State and its people to provisions of Act, as reflected in act and territorial legislature not only failed to approve an amendment incorporating restriction of Act into Constitution, but no constitutional convention was ever called to act on

**Note 8**

matter, Alaska Statehood Act, §§ 6(l), 8(b), 48 U.S.C.A. preceding section 21. State v. Lewis, 559 P.2d 630. Alaska,1977. Constitutional Law ⚖ 540

That provision of Constitution specifying means of amendment remained inoperative unless Alaska was admitted into Union did not mean that favorable vote, prior to admittance, on proposition requiring consent by State in its default to provisions of Alaska Statehood Act reserving rights or powers to United States, as well as those prescribing terms or conditions of grants of lands or other property therein made to State of Alaska amounted to internal reservation to include terms or conditions of grants of land set forth in Alaska Statehood Act. Const. art. 13, §§ 1, 4; Alaska Statehood Act, § 8(b), 48 U.S.C.A. preceding section 21. State v. Lewis, 559 P.2d 630. Alaska,1977. Constitutional Law ⚖ 540

**7. Roads and highways**

Where defendant construction company contracted with state of Alaska for construction of pioneer road across land held by plaintiff under grazing lease from United States, and lease provided that "Nothing herein shall restrict the acquisition, granting, or use of permits or rights-of-way under applicable law," construction of road without consent of lessee was authorized and construction company was not liable to lessee for entry in absence of showing of negligence in construction of road or damages to lessee therefrom. AS 19.30.010-19.30.100, 19.30.020, 19.30.040, Alaska Statehood Act, § 6(a), 48 U.S.C.A. preceding section 21; 43 U.S.C.A. § 932. Act Cong., Mar. 4, 1927. ... 43 U.S.C.A. § 315. Mercer v. Yutan Const. Co., 420 P.2d 323. Alaska,1966. Public Lands ⚖ 17

Evidence that construction company which contracted with state of Alaska to build pioneer road across land held by plaintiff under grazing lease from United States established finding that road construction was not negligent and that construction was not cause of flooding of lessee's hay meadow. AS 19.30.010-19.30.100, 19.30.020, 19.30.040, Alaska Statehood Act, § 6(a), 48 U.S.C.A. preceding section 21; 43 U.S.C.A. § 932. Act Cong., Mar. 4, 1927, §§ 3(6), 16, 44 Stat. 1452; Taylor Grazing Act, § 1 as amended 43 U.S.C.A. § 315; Rules of Civil Procedure, rule 52(a). Mercer v. Yutan Const. Co., 420 P.2d 323. Alaska,1966. Public Lands ⚖ 17

**8. Federal enactments and regulatory powers**

Where no reading of words of statute, no part of legislative history and no contemplation of

Alaska Native Claims Settlement Act and, as such, is not violative of constitutional prohibition on local and special legislation. Laws 1976, c. 45, § 19; Alaska Stat. § 38.05.060; Const. art. 2, § 19; Alaska Statehood Act, § 6(d), 48 U.S.C.A. preceding section 21; Alaska Native Claims Settlement Act, § 22(l), 43 U.S.C.A. § 1621(l). State v. Lewis, 559 P.2d 630. Alaska,1977. Statutes ⚬ 82

Incorporation of North Slope Borough net revenues from standard subdivisions including the geography of standard subdivisions inclusion of a private petroleum reserve No. 4 in view of showing of the reserve's importance to the subsistence life style of area residents. AS 07.10.030(2); Alaska Statehood Act, 48 U.S.C.A. preceding section 21. Mobil Oil Corp. v. Local Boundary Commission, 518 P.2d 92. Alaska,1974. Municipal Corporations ⚬ 7

Where plaintiff and State of Alaska were parties to litigation in federal court which determined validity of state's selection of public lands under Alaska Statehood Act, issues under Alaska Statehood Act, action taken in land originally selected from federal government under Alaska Statehood Act, as barred by court precluding subsequent action, was barred by principles of res judicata. Alaska Statehood Act, §6(b), 48 U.S.C.A. note preceding § 21. McCubbins v. Keenan, 475 P.2d 696. Alaska,1970. Judgment⚬ 829(1)

**11.   Reservation of rights, mining and mineral rights**

Minerals contained in gold mine tailings which were disposed on tidal and submerged merged lands became real property, even though tailings had not been abandoned and, therefore, title to tailings passed to state upon statehood, and were reserved by state in patent granting property to mine operator. Alaska Statehood Act, §§ 1 et seq., 6(m), 48 U.S.C.A. note preceding § 21; AS 38.05.320 (now AS 38.05.820). Hayes v. Alaska Juneau Forest Industries, Inc., 748 P.2d 332. Alaska,1988. Navigable Waters ⚬ 36(3); Navigable Waters ⚬ 37(4)

Title to minerals contained in mine tailings, which had been disposed of on tidal and submerged lands, passed to state upon statehood and were reserved by state in patent, which conveyed surface of every name, kind, or description in or upon land. Alaska Statehood Act, §§ 1 et seq., 6(m), 48 U.S.C.A. note prec. § 21; AS 38.05.320 (now AS 38.05.820). Hayes v. Alaska Juneau Forest Industries, Inc., 748 P.2d 332. Alaska,1988. Mines And Minerals ⚬ 3; Mines And Minerals ⚬ 4

A compact arose as a result of the adoption of the constitutional provisions agreeing that all sales or grants of lands be subject to such reservations as Congress shall require and the federal imposition of restrictions on alienation of mineral rights subsequently passed. In order to augment the federal holdings from which statewide land use management and to resolve a host of pressing legal issues arising in context of

sufficient to establish historic title to lower Cook inlet as inland water, especially since it appeared that the geographic scope of such enforcement efforts were determined primarily, if not exclusively, by the needs of effective management rather than as an intended assertion of territorial sovereignty to exclude all foreign vessels and navigation. Submerged Lands Act, §§ 2,8, 43 U.S.C.A. §§ 1301-1315; Alaska Statehood Act, § 6(m), 48 U.S.C.A. preceding section 21; Act of June 4, 1897, c. 2, 30 Stat. 11, 36 Stat. 855, Act of June 6, 1906, 34 Stat. 263; Act of June 6, 1924, 43 U.S.C.A. 464. U.S. v. Alaska, 95 S.Ct. 2240. U.S.Alaska,1975. Navigable Waters ⚬ 4

Plaintiffs, who claimed that three-way exchange of land between State of Alaska and United States under this section would result in losses to state treasury and taxpayers of vast sums of money, who sought to protect mineral resources in land originally selected from federal government under Alaska Statehood Act, as would not automatically succeed to state under Title 48, and who as citizens and taxpayers were in a better position than governor and Attorney General to complain of exchange, had a sufficient personal stake in outcome of controversy to guarantee "the adversity which is so fundamental to the judicial process" and had standing to bring suit challenging constitutionality of exchange. State v. Lewis, Alaska 1977, 559 P.2d 630, appeal dismissed, certiorari denied 97 S.Ct. 2943, 432 U.S. 901, 53 L.Ed.2d 1073. Constitutional Law 42.3(2) Constitutional Law 721

There is no provision in our constitution against direct and indirect lobbying that operates to preclude a land exchange pursuant to an agreement whereby the state will relinquish certain lands, including the subsurface minerals thereto, in to the United States in order to augment the federal holdings thus enabling state to carry out orderly program of obtaining the entitlements and, hence, legislative approval of exchange is sufficient once Congress consents to lifting restrictions imposed against alienation of mineral rights. Laws 1976, c. 19; Art. 8, § 6, mineral rights, Laws 1976, c. 19; AS 38.05.810, 38.05.060; Alaska Statehood Act, § 6(b), 6(m), 48 U.S.C.A. note prec. § 21; Alaska Native Claims Settlement Act, § 22(l), 43 U.S.C.A. § 1621(l). State v. Lewis, 559 P.2d 630. Alaska,1977. Mines And Minerals ⚬ 4

Statute authorizing a land exchange pursuant to an agreement whereby the state agrees to relinquish certain lands, including the subsurface minerals thereto, to the United States in order to augment the federal holdings from which regional native corporations are to obtain their aboriginal entitlements is designed to facilitate statewide land use management and to resolve a

---

possible objective led with absolute certainty to clear answer. Interior Secretary's interpretation of powers conferred upon him by Congress, while not binding on court, was nevertheless entitled to considerable weight. Alaska Statehood Act, § 6(e), 48 U.S.C.A. preceding section 21. Ketchikan Packing Co. v. Seaton, 267 F.2d 660. C.A.D.C.1959. Statutes ⚬ 219(5)

In view of variety of federal interests and comprehensive scheme of regulation established by Congress, any regulation or operation of survival of state regulation inconsistent with substantive federal plan was to be resolved against state's assertion of authority. Marine Mammal Protection Act of 1972, §§ 2 et seq., 101, 101(a)(1, 2), (b), 103(b)(5), 109, 109(a)(1, 2), (c), 16 U.S.C.A. §§ 1361 et seq., 1371, 1371(a)(1, 2), (b), 1373(b)(5), 1379, 1379(a)(1, 2), (c); Endangered Species Act of 1973, §§ 2 et seq., 10(e)(1), 16 U.S.C.A. §§ 1531 et seq., 1539(e)(1); Alaska Statehood Act § 6, 48 U.S.C.A. preceding section 21; U.S.C.A.Const. art. 6, cl. 2; Endangered Species Act of 1973, §§ 2 et seq., 10(e)(1), 16 U.S.C.A. §§ 1531 et seq., 1539(e)(1); Alaska Statehood Act, § 6, 48 U.S.C.A. preceding section 21; 48 U.S.C.A. preceding section 21; People of Togiak v. U.S., 470 F.Supp. 423. D.D.C.1979. Statutes ⚬ 18.5

Marine Mammal Protection Act was designed to substitute for diverse state marine mammal hunting laws a comprehensive federal scheme and Native exemption section preempted field, invalidating regulations of Department of Interior purporting to transfer to State of Alaska power to regulate such hunting. Marine Mammal Protection Act of 1972, §§ 2 et seq., 101(a)(1, 2), (b), 103(b)(5), 109, 109(a)(1, 2), (c), 16 U.S.C.A. §§ 1361 et seq., 1371, 1371(a)(1, 2), (b), 1373(b)(5), 1379, 1379(a)(1, 2), (c); Endangered Species Act of 1973, §§ 2 et seq., 6, cl. 2; Endangered Species Act of 1973, §§ 2 et seq., 10(e)(1), 16 U.S.C.A. §§ 1531 et seq., 1539(e)(1); Alaska Statehood Act, § 6, 48 U.S.C.A. preceding section 21; 48 U.S.C.A. § 248 et seq., People of Togiak v. U.S., 470 F.Supp. 423. D.D.C.1979. Statutes ⚬ 9

---

People of state of Alaska, in permitting Civil Aeronautics Board to regulate state's intrastate air commerce during period of transition from territory to state, by an arrangement which could be terminated by Alaska at any time it chose to act, surrendered no sovereignty, and statutory provisions permitting Board so to act were not unconstitutional. Alaska Statehood Act, § 8(d), 48 U.S.C.A. preceding section 23; Alaska Omnibus Act, § 3, 48 U.S.C.A. preceding section 21; Federal Aviation Act of 1958, § 401(a), 49 U.S.C.A. § 1371(a), Alaska Airlines, Inc., 188 F.Supp. 107. D.Alaska,1960. States ⚬ 4.16(3); States ⚬ 9

Text of Alaska Statehood Act makes it clear that federal legislative enactments were to be carried over unless overruled by State Constitution, in state legislature, and state could not unilaterally incorporate and maintain federal case law, or administrative law, unless and until changed by legislature. Alaska Statehood Act, § 8(d), 48 U.S.C.A. prec. § 21. Dresser Industries, Inc. v. Alaska Dept. of Labor, 633 P.2d 998. Alaska,1981. States ⚬ 9

Although section 21 did not automatically incorporate federal administrative law which manifests intent to safeguard existing minimum wage and overtime standards is not prohibition of change, and direction to court to apply federal regulatory definition "where applicable" means that such definitions are applicable only when Director of Wage and Hour Division and Commissioner of Labor have refrained from defining terms of state regulations; thus, Director was authorized to promulgate regulation which, contrary to variety rule, applied Alaska Statehood Act, § 8(d), 48 U.S.C.A. prec. § 21; AS 23.10.050,. 23.10.050(5), 23.10.080, 23.10.145. Dresser Industries, Inc. v. Alaska Dept. of Labor, 633 P.2d 998. Alaska,1981. Labor And Employment ⚬ 2217(l); States ⚬ 9

**9.   Lawyers**

Provision in Alaska Statehood Act that territorial law should continue in force does not limit Supreme Court's inherent power to discipline Alaska lawyers while law was still in force a provision in the Territorial Integrated Bar Act of 1955 claimed to have that effect. A.C.L.A.Supp. §§ 35-2.77a to 35-2.77o as amended by Laws 1960, c. 178, § 6, now AS 08.08.010 to 08.08.250. Alaska Statehood Act, § 8(d), 48 U.S.C.A. preceding section 21. In re MacKay; 416 P.2d 823. Alaska,1964. States ⚬ 9

**10.   Mining and mineral rights—In general**

Enforcement of fishing and wildlife regulations was neither arbitrary nor discriminatory nor could Alaska courts, by legislative or executive order during period of United States sovereignty over Territory of Alaska was not

Note 11

ALASKA STATEHOOD ACT

Note 14

Congress give its consent to a change in its terms, not that there be a state constitutional amendment. Consent of Congress pursuant to preceding section 21. State v. Lewis, 559 P.2d 630, Alaska,1977. Mines And Minerals ⟨⟩ 4; States ⟨⟩ 4.19

**12. — Mineral leases, generally, mining and mineral rights**

Effect of state governing distribution to Territory of Alaska of proceeds of federal mineral leases and section of Alaska Statehood Act governing same was that of Mineral Leasing Act of 1920 (MLA) applicable to Alaska on same terms as to other states; straightforward reading of Statehood Act was a device to put Alaska in same position as states with respect to distribution of such proceeds, neither Act nor MLA specifically required federal government to lease mineral deposits, Act did not specifically promise that royalties due to Alaska would always be calculated in same way, Congress retained power to amend MLA to change distribution formula applicable to all states, Conditions of Statehood Act were not meant as literal promises or statutory construction, and Secretary of Interior was not specially delegated by Congress either to negotiate or to interpret what Congress had done. State of Alaska v. U.S., Fed.Cl.1996, 35 Fed.Cl. 685, affirmed 119 F.3d 16, certiorari denied 118 S.Ct. 1035, 522 U.S. 1108, 140 L.Ed.2d 102. Mines And Minerals 5.1(8)

Section of Alaska Statehood Act governing distribution to state of proceeds of federal mineral leases carried with it no promise on part of United States to exploit mineral resources productive of royalty revenues for state; section at issue contained no express substantive obligation to which implied obligation of good faith and fair dealing might attach, and did not create non-participating royalty interest on part of state, federal fiduciary relationship necessary to make federal government exercise poor judgment in managing federal resource, no judicially manageable standards applied to federal decision making in question, continuing duty to manage federal lands for the benefit of state could arise only in context of fiduciary relationship, and federal government's discretion in management of its own lands has historically been virtually unfettered. Alaska Statehood Act, § 28(b), 48 U.S.C.A. prec. § 21. State of Alaska v. U.S., 35 Fed.Cl. 685. Fed. Cl.1996. Mines And Minerals 5.1(8)

Alaska Statehood Act governing distribution to state of proceeds of federal mineral leases did not create promise on part of federal government to pay Alaska, in perpetuity,

90 percent of gross mineral leasing revenues from federal mineral leases in Alaska; section of Statehood Act at issue merely introduced Alaska into pre-existing legislative scheme for distribution of proceeds from federal mineral leases, which scheme was subject to legislative amendment, section-at-issue using term "net" referred to separate federal statute governing other types of leases which employed such term, and nothing in legislative record indicated intent to give Alaska privileged position with respect to other states in calculating its share of revenues from federal leases. Alaska Statehood Act, § 28(b), 48 U.S.C.A. prec. § 21; 48 U.S.C.(1952 Ed.) § 439. State of Alaska v. U.S., 35 Fed.Cl. 685. Fed.Cl.1996. Mines And Minerals 5.1(8)

Taxpayer-citizens could maintain declaratory judgment action for construction of statute which was enacted to further goal of State mineral leasing requirement of Alaska Statehood Act, § 6(i), 48 U.S.C.A. prec. § 21. Trustees for Alaska v. State, 736 P.2d 324. Alaska,1987. Declaratory Judgment ⟨⟩ 296

Mineral leasing restriction in Alaska Statehood Act was considered to further goal of State mineral leasing requirement of Alaska Statehood Act, § 6(i), 48 U.S.C.A. prec. § 21. Trustees for Alaska v. State, 736 P.2d 324. Alaska,1987. Mines And Minerals 5.2(1)

Mineral leasing requirement in Alaska Statehood Act considered in context of School Lands Act and Mineral Leasing Act, other statehood acts, and mineral leasing systems in other states, mandates system under which State must receive net or royalties for its mineral leases. 43 U.S.C.A. § 870(b); Alaska Statehood Act, § 6(i), 48 U.S.C.A. prec. § 21; Mineral Lands Leasing Act, § 1 et seq., 30 U.S.C.A. § 181 et seq. Trustees for Alaska v. State, 736 P.2d 324. Alaska,1987. Mines And Minerals 5.2(1)

Because Alaska's mineral leases do not require rents or royalties, in that value of required annual labor may be credited against rental, leases did not comply with Alaska Statehood Act. Alaska Statehood Act, § 6(i), 48 U.S.C.A. prec. § 21; AS 38.05.185, 38.05.205, 38.05.205(b), 38.05.210. Trustees for Alaska v. State, 736 P.2d 324. Alaska,1987. Mines And Minerals 5.2(1)

Grant language in first sentence of section of mineral leasing requirement of Alaska Statehood Act was intended to convey only mineral deposits in selected lands whose mineral character was known at time of selection. Alaska Statehood Act, § 6(i), 48 U.S.C.A. prec. § 21. Trustees for Alaska v. State, 736 P.2d 324. Alaska,1987. Mines And Minerals 5.2(1)

Coalition of environmental, Native, and fishing groups had standing as taxpayer-citizens to maintain action for declaratory judgment that

State's mineral leasing system violates Alaska Statehood Act because the statute does not require payment, rents or royalties on mining leases, and merely incorrectly construed lease restriction in Act to apply only to those lands known to have been mineral in character at time of State selection; case was one of public significance, in that, if plaintiffs prevailed, State would have clear method of making State land available for mining, and plaintiffs were proper parties to bring suit. Alaska Statehood Act, § 6(a, b, i), 48 U.S.C.A. prec. § 21. Trustees for Alaska v. State, 736 P.2d 324. Alaska,1987. Declaratory Judgment ⟨⟩ 296

Congress's intent to preclude all litigation of express provisions of mineral lease section of Alaska Statehood Act by enacting forfeiture proviso applicable when lands or minerals are disposed of contrary to provisions section; Congress intended only forfeiture proceedings by General Attorney in United States District Court for District of Alaska. Alaska Statehood Act, § 6(a, b, i), 48 U.S.C.A. prec. § 21. Alaska Statehood Act, § 6(a, b, i), 48 U.S.C.A. prec. § 21. Trustees for Alaska v. State, 736 P.2d 324. Alaska,1987. Mines And Minerals 5.2(1)

**13. — Oil and gas leases, mining and minerals**

Ownership of oil and gas that were subject matter of "Alaska Fire" law did not constitute sufficient justification for law's discrimination against nonresidents where search of law included employers who had no connection with state's oil and gas, perpetual relationship between state and its oil and gas, and received no payment from state and coverage of law was not limited to activities connected with extraction of Alaska's oil and gas. AS 38.40.010-38.40.090, 38.40.050(a); U.S.C.A.Const. art. 4, § 2; U.S.C.A. Const. art. 4, § 2. Hicklin v. Orbeck, 98 S.Ct. 2482, U.S.Alaska,1978. Constitutional Law ⟨⟩ 2953; Labor And Employment ⟨⟩ 3

Application for oil and gas lease on public land which was pending at time state land law took effect was governed by statutory provision that such taking shall not affect any valid existing claim under laws of United States. Mineral Lands Leasing Act, § 1 et seq., 30 U.S.C.A. § 181 et seq. Act July 7, 1958, § 6(b), 72 Stat. 339. Schraier v. Hickel, 419 F.2d 663. C.A.D.C.,1969. Mines And Minerals 5.1(1)

Expenses incurred by applicant in support of defense of his application for oil and gas lease on public land did not establish existing valid

right or equitable claim subject to allowance and confirmation under the Alaska Statehood Act. Act July 7, 1958, § 6(g), 72 Stat. 339. Schraier v. Hickel, 419 F.2d 663. C.A.D.C.,1969. Mines And Minerals 5.1(1)

Action of Secretary of Interior in making "deficiency" withdrawals" of Alaska North Slope public lands, and denying applications for federal oil and gas leases as to lands affected by such withdrawals, allocating such lands instead to Arctic Slope Regional Corporation pursuant to Alaska Native Claims Settlement Act of 1971, was not an arbitrary, capricious abuse of Secretary's discretion; Mineral Lands Leasing Act, § 1 et seq.; 30 U.S.C.A. § 181 et seq.; Alaska Native Claims Settlement Act, §§ 2 et seq., 11(a), (a)(1, 3), (a)(3)(A, B), 16(a)(1), 11(a), (a)(1, 3), (a)(3)(A, B), 11(a), (b), 16(a)(1), 17(a)(1)(D), (d)(1, 3), (a)(3)(A, B), 1611, 16(b)(6)(D), (b)(1, 3), (a)(3)(A, B), 1611(a)(1), 1613, 16166(b)(1), (d)(1, 2), 1621(e); Alaska Statehood Act, § 10 as amended 48 U.S.C.A. preceding section 21. Rowe v. U.S., 464 F.Supp. 1060. D.Alaska,1979. Mines And Minerals 5.1(8); United States 57

Where action by Congress to change law respecting granting of extensions of oil and gas leases with respect to lands in Alaska reserved for support of schools became vested in state of Alaska when lands subject to lease were granted to state, 48 U.S.C.A. preceding § 23. Kirkpatrick v. Commissioner, Dept. of Natural Resources, 391 P.2d 7. Alaska,1964. Mines And Minerals 5.1(7)

Where at time federal oil and gas lease of Alaska land reserved for support of schools had been accepted renewal by lessee or successor in state assignee before it being changed by law at any time prior to expiration of initial term, lessee's assignee after expiration of initial term and after power to change law respecting extension became vested in state of Alaska was entitled only to extension as to which Alaska legislation had provided, 48 U.S.C.A. preceding § 23. Alaska Statehood Act, § 6(b), 48 U.S.C.A. preceding § 23; Mineral Lands Leasing Act, § 17 as amended 30 U.S.C.A. § 226. Kirkpatrick v. Commissioner, Dept. of Natural Resources, 391 P.2d 7. Alaska,1964. Mines And Minerals 5.1(7)

**14. Waters and watercourses—Internal waters**

Where, at time of admission of Alaska into union, United States maintained position that, with exception of historic bays, seaward limit of inland waters, waters within bay, coasts of which belonged to single state, was considered internal waters if distance between low water marks of natural entrance points did not exceed ten miles, limits of internal waters of Alaska in nonhistoric bay extended only to line drawn across bay at most seaward point where distance between low water marks did not exceed ten miles. Alaska State-

56

57

Case 3:16-cv-05766-JCS   Document 5-1   Filed 10/13/16   Page 44 of 55

State's position; regardless of how the incident was viewed, it could not be concluded that Alaska's exercise of sovereignty was acquiesced in by Japan, which immediately protested and never acceded to Alaska's position. Submerged Lands Act, §§ 2-8, 43 U.S.C.A. §§ 1301-1315; Alaska Statehood Act, § 6(m), 48 U.S.C.A. preceding section. U.S. v. Alaska, 95 S.Ct. 2240. U.S.Alaska,1975. Navigable Waters ⟺ 4

Issuance by Tsar Alexander I in 1821 of a ukase that purported to exclude all foreign vessels from waters within 100 miles of the Alaska Coast was inadequate as a demonstration of Russian authority over waters of Cook Inlet, for purpose of determining its establishment as a historic bay, where shortly after it had been issued the ukase was unequivocally withdrawn in face of vigorous protests from the United States and England. Submerged Lands Act, §§ 2-8, 43 U.S.C.A. §§ 1301-1315; Alaska Statehood Act, § 6(m), 48 U.S.C.A. preceding section. U.S. v. Alaska, 95 S.Ct. 2240. U.S.Alaska,1975. Navigable Waters ⟺ 4

In absence of any external enforcement or official assertion of Russian jurisdiction, an early Alien Fishing Act of 1906 in Cook Inlet, for the private intentions of former wildlife officials that they would have taken affirmative action against foreign vessels if they had seen any in the inlet was largely irrelevant in determining establishment of lower portion of the inlet as a historic bay. Submerged Lands Act, §§ 2-8, 43 U.S.C.A. §§ 1301-1315; Alaska Statehood Act, § 6(m), 48 U.S.C.A. preceding section. U.S. v. Alaska, 95 S.Ct. 2240. U.S.Alaska,1975. Navigable Waters ⟺ 36(1)

Submerged lands had no application to lands acquired by Alaska public lands withdrawn prior to statehood for establishment of Moose Range. Submerged Lands Act, §§ 1 et seq., 5, 43 U.S.C.A. §§ 1301 et seq.; 1313; Alaska Statehood Act, § 6(e), 48 U.S.C.A. preceding § 21. U.S. v. State of Alaska, 521 F.2d 794. C.A.9,Alaska,1970. Navigable Waters ⟺ 36(1)

**17.  Rivers and navigable lands, submerged lands**

United States maintained ownership of submerged lands within National Petroleum Reserve-Alaska at Alaska's statehood; Executive Order creating Reserve reflected clear intent to include submerged lands, and Alaska Statehood Act reflected clear congressional statement that United States owned and would continue to own submerged lands. Sub.nr.Alaska, U.S.A.1997, 117 S.Ct. 1888, 521 U.S. 1, 138 L.Ed.2d 231, rehearing denied 118 S.Ct. 19, 521 U.S. 1144, 138 L.Ed.2d 1051. Navigable Waters ⟺ 36(1)

River was navigable at time of Alaska's statehood, and title to submerged lands passed to

---

Even if boundary selected for purposes of enforcing fish and wildlife regulations coincided with international sovereignty boundary, mere unilateral assertion of territorial sovereignty over Cook Inlet as inland waters, historic title to the lower bay was not established in the Alaska Statehood Act entitlement. State of Alaska v. U.S., D.Alaska 1987, 662 F.Supp. 455, affirmed 891 F.2d 1401, certiorari denied 110 S.Ct. 1949, 495 U.S. 919, 109 L.Ed.2d 312. Navigable Waters ⟺ 36(1)

**16.  Submerged lands—In general**

United States did not transfer to Alaska offshore submerged lands within Arctic National Wildlife Range at statehood; pre-statehood application by Bureau of Sport Fisheries and Wildlife for withdrawal of lands included submerged lands within territory Range under Alaska Statehood Act. Alaska Statehood Act, § 6(m), 48 U.S.C.A. prec. § 21; 43 C.F.R. § 295.11 (1958). U.S. v. Alaska, 117 S.Ct. 1888. U.S.,1997. Navigable Waters ⟺ 36(1)

Suit to quiet title to lower part of Cook Inlet and to enjoin Alaska from offering oil and gas leases for sale in the area could have been brought as an original action in the Supreme Court. Submerged Lands Act, §§ 2-8, 43 U.S.C.A. §§ 1301-1315; U.S.C.A. art. 3, § 2, cl. 2; Alaska Statehood Act, § 6(m), 48 U.S.C.A. preceding section. 21. U.S. v. Alaska, 95 S.Ct. 2240. U.S.Alaska,1975. Federal Courts ⟺ 442.1

For Alaska to establish historic title to Cook Inlet as inland waters, the exercise of sovereignty over waters would have to be by an assertion of power to exclude all foreign vessels and navigation. Submerged Lands Act, §§ 2-8, 43 U.S.C.A. §§ 1301-1315; Alaska Statehood Act, § 6(m), 48 U.S.C.A. preceding section. 21. U.S. v. Alaska, 95 S.Ct. 2240. U.S.Alaska,1975. Navigable Waters ⟺ 4

Since general enforcement of fishing regulations in Cook Inlet or the United States during its sovereignty over Territory of Alaska was insufficient to demonstrate sovereignty over the inlet as inland waters, Alaska's following the mere fishing regulation enforcement was insufficient to give rise to historic title to the inlet as inland waters. Submerged Lands Act, §§ 2-8, 43 U.S.C.A. §§ 1301-1315; U.S.C.A. § 6(m), 48 U.S.C.A. preceding section 21. U.S. v. Alaska, 95 S.Ct. 2240. U.S.Alaska,1975. Navigable Waters ⟺ 4

Since distance between natural entrance points to Cook Inlet is in excess of 24 miles, State of Alaska, in order successfully to claim sovereignty over lower waters of the inlet and land beneath those waters, was required to demonstrate that the inlet was a historic bay. Submerged Lands Act, §§ 2-8, 43 U.S.C.A. §§ 1301-1315; U.S.C.A. § 6(m), 48 U.S.C.A. preceding section. 21. U.S. v. Alaska, 95 S.Ct. 2240. U.S.Alaska,1975. Navigable Waters ⟺ 36(1)

---

ka when Alaska entered the Union; therefore, beds of navigable waterbodies in Alaska were not available for selection or chargeable to either the Alaska Native Claims Settlement Act or the Alaska Statehood Act entitlements. State of Alaska v. U.S., D.Alaska 1987, 662 F.Supp. 455, affirmed 891 F.2d 1401, certiorari denied 110 S.Ct. 1949, 495 U.S. 919, 109 L.Ed.2d 312. Navigable Waters ⟺ 36(1)

In absence of congressional grant of limits of internal waters of Alaska, internal waters of that state remained what they were upon passage by Congress of Alaska Statehood Act. Alaska Statehood Act, §§ 2, 6(m), 8(b), 48 U.S.C.A. note preceding § 21. U.S. v. State of Alaska, 236 F.Supp. 388. D.Alaska,1964.

In absence of specific congressional action to contrary, internal waters of state of Alaska were those waters which on date of its admission into union were recognized by executive branch of government in its dealings with foreign nations to be internal waters of United States and territory of Alaska. Alaska Statehood Act, §§ 2, 6(m), 8(b), 48 U.S.C.A. prec. § 21; Submerged Lands Act, §§ 2-8, 43 U.S.C.A. §§ 1301(c), 1302, 1311, 1312; Outer Continental Shelf Lands Act, § 3, 43 U.S.C.A. § 1332. U.S. v. State of Alaska, 236 F.Supp. 388. D.Alaska,1964.

**15.  — Riverbeds, waters and watercourses**

Title to riverbed lying beneath navigable waters in Alaska did not pass from federal government to state of Alaska at time it became a state, as riverbed was previously withdrawn by United States for military purposes, and power of exclusive legislation over riverbed was reserved in United States under Alaska Statehood Act, despite claim that land was no longer used for military purposes at time of statehood, that residence under riverbed only to minerals, and that Congress reserved right to riverbeds; nor military reservation, was actually opened to private mineral exploration and mining. Engle Act, § 6, 43 U.S.C.A. § 158. Submerged Lands Act, § 5(a), 43 U.S.C.A. § 1313(d); 43 U.S.C.A. § 158; Alaska Statehood Act, § 11, 48 U.S.C.A. prec. § 21; Alaska v. U.S., 213 F.3d 1092. C.A.9,Alaska,2000. Navigable Waters ⟺ 36(1)

Federal government's revocation of public land order that had withdrawn land in Alaska encompassing riverbed lying beneath navigable waters, after Alaska obtained statehood, did not cause title to riverbed to pass from federal government to state, where, if, under Alaska Statehood Act, federal government thereby lost exclusive legislative jurisdiction over lands because they were no longer being used for military purposes. Submerged Lands Act, § 5(a), § 1, 48 U.S.A. §1313(a); Alaska Statehood Act, § 11, 48 U.S.C.A. prec. § 21; Alaska v. U.S., 213 F.3d 1092. C.A.9,Alaska,2000. Navigable Waters ⟺ 36(1)

Title to beds of navigable inland waterbodies in Alaska passed from the United States to Alas-

---

Even if boundary selected for purposes of enforcing fish and wildlife regulations coincided with international sovereignty boundary, mere unilateral assertion of territorial sovereignty over Cook Inlet as inland waters, historic title to the lower bay was not established in the Alaska Statehood Act entitlement.

For Alaska to establish historic title to Cook Inlet as inland waters, the exercise of sovereignty over waters would have to be by an assertion of power to exclude all foreign vessels and navigation.

trader, who about 1786 fired a cannon at an English vessel attempting to enter Cook Inlet in vicinity of Port Graham, was acting with government authority, such incident was entitled to little legal significance in determining whether Alaska exercised sufficient authority over the entire inlet as to acquire status of historic bay; in any event, under the then common Cannon Shot Rule, firing of a cannon from shore was wholly consistent with present position of the United States that the inlet was inland waters, since maximum sovereignty over the inlet at time Graham are to be measured by the three-mile band. Submerged Lands Act, §§ 2-8, 43 U.S.C.A. §§ 1301-1315; U.S.C.A.Const. art. 3, § 2, cl. 2; Alaska Statehood Act, § 6(m), 48 U.S.C.A. preceding section 21. U.S. v. Alaska, 95 S.Ct. 2240. U.S.Alaska,1975. Navigable Waters ⟺ 36(1)

Since distance between natural entrance points to Cook Inlet is in excess of 24 miles, State of Alaska, in order successfully to claim sovereignty over lower waters of the inlet and land beneath those waters, was required to demonstrate that the inlet was a historic bay.

Alaska at that time, if river was susceptible to use as highway for commerce, regardless of actual use of river; such use did not have to be without difficulty, extensive, or long and continuous, and it was not essential that such use involve transportation of water-borne freight by carrier whose purpose was to make money from transportation. Submerged Lands Act, § 3(a), 43 U.S.C.A. § 1311(a); Alaska Statehood Act, § 6(m), 48 U.S.C.A. prec. § 21. State of Alaska v. Ahtna, Inc., 891 F.2d 1401. C.A.9.Alaska.1989. Navigable Waters ⟜ 36(1)

Present commercial use of Gulkana River in Alaska provided conclusive evidence of river's susceptibility to commercial use at time of statehood and, therefore, title to submerged lands passed to Alaska at statehood where some reservation of title, notwithstanding recreational nature of uses of river, given present fishing and sightseeing industry conducted on river and parties' stipulation that river's physical characteristics had remained unchanged. Submerged Lands Act, § 3(a), 43 U.S.C.A. § 1311(d); Alaska Statehood Act, § 6(m), 48 U.S.C.A. prec. § 21. State of Alaska v. Ahtna, Inc., 891 F.2d 1401. C.A.9.Alaska.1989. Navigable Waters ⟜ 36(1)

Claim that title to submerged lands beneath river did not pass to Alaska at statehood because of reservation of title by Congress would be considered on appeal, though it was raised for first time on appeal, because issue was purely legal and facts were fully developed. Alaska Statehood Act, § 6(m), 48 U.S.C.A. prec. § 21. State of Alaska v. Ahtna, Inc., 891 F.2d 1401. C.A.9.Alaska.1989. Federal Courts ⟜ 612.1

Party seeking to overcome State's interest in submerged lands beneath navigable water must show that Congress clearly intended to include land under navigable waters within federal reservation and that Congress affirmatively intended to defeat future State title to such land. Alaska Statehood Act, § 6(m), 48 U.S.C.A. prec. § 21. State of Alaska v. Ahtna, Inc., 891 F.2d 1401. C.A.9.Alaska.1989. Navigable Waters ⟜ 36(1)

### 18. Transportation by water

Under terms of Shipping Act of 1916, Intercoastal Shipping Act of 1933 and Alaska Statehood Act, jurisdiction over water common carriers engaged in interstate commerce in Alaska trade was reposed in Federal Maritime Commission. Shipping Act, 1916, § 1 et seq., 46 U.S.C.A. § 801 et seq.; Intercoastal Shipping Act, 1933, § 1 et seq., 46 U.S.C.A. § 843 et seq.; Alaska Statehood Act, § 4, 48 U.S.C.A. §§ 1 et seq., 27(b), Sea-Land Service, Inc. v. Federal Maritime Commission, 404 F.2d 824. C.A.D.C.1968. Navigable Waters ⟜ 36(1)

Arrangement between common carrier by water and motor carriers whereby motor carrier picked up tariff cargo at shipper's premises and delivered it to pier for loading and shipment to various ports and motor carrier issued through bills of lading in its name covering entire journey up to final delivery and charged for full journey was "through route" and "joint rate" arrangement and rates were subject to the Interstate Commerce Commission jurisdiction. Shipping Act, 1916, §§ 1-44, 46 U.S.C.A. §§ 801-842. Intercoastal Shipping Act, 1933, §§ 1-8, 2, 46 U.S.C.A. §§ 843-848, 844; Interstate Commerce Act, §§ 1, 323, 216(c), 305(b), 49 U.S.C.A. §§ 1, 323, 316(c), 305(b). Alaska Statehood Act, §§ 3, 27(b), 48 U.S.C.A. § 21. Alaska S.S. Co. v. Federal Maritime Commission, 399 F.2d 623. C.A.9.Wash.1968. Commerce ⟜ 85.18

### 19. Hunting and fishing, generally

Court of Appeals would exercise judicial discretion and dismiss suit by unincorporated association of commercial fishermen to have declared invalid a revocable special land use permit issued to Department of Agriculture for construction and operation of oil tank farm and terminal facility within Chugach National Forest, Alaska, without a determination on the merits, despite the existence of jurisdiction, where no further construction would take place until Congress resolved certain problems and until Dry Pass and tank right of way under Alaska Statehood Act could validly acquire the land under Alaska Statehood Act. 16 U.S.C.A. §§ 497, 497a, 551; Act July 7, 1958, 72 Stat. 339, Wilderness Soc. v. Morton, 479 F.2d 842, C.A.D.C.1973. Declaratory Judgment ⟜ 395

In effect, Westland proviso made Secretary of Interior a "trustee" for both federal government and new state of Alaska in the broad national interest during transition of administration from federal to state authorities and, in that unique capacity, Secretary could exercise such power as would vest if Alaska which was "existing" on effective date of Alaska Statehood Act, which defined his powers over wildlife resources for interim period commencing on that date; and Secretary reasonably read words "under existing laws" in Westland proviso as including only those Native populations effectively with Statehood Act, and be properly concluded that Statehood Act, which "accepted, ratified and confirmed" Alaska Constitution and ordinances, amended White Act by prohibiting use of fish traps in Alaskan waters, as set forth in ordinance. Act July 7, 1958, §§ 22 et seq., Alaska Statehood Act, § 6, 48 U.S.C.A. preceding section 21. Ketchikan Packing Co. v. Seaton, 267 F.2d 660. C.A.D.C.1959. Fish ⟜ 9; States ⟜ 9

Under the "BLM Organic Act" the Secretary of the Interior has power to administer a program by the State of Alaska, on federally controlled land as "administration" which state title as one of the purposes for which the secretary may designate areas where no hunting will be permitted includes wildlife management and the provision of the Alaska Statehood Act which gives the State right to control wild life does not alter this result. Federal Land Policy and Management Act of 1976, §§ 102 et seq., 103(c), 302(a, b), 43 U.S.C.A. §§ 1701 et seq., 1702(c), 1732(a, b), Alaska Statehood Act, § 6(e), 48 U.S.C.A. preceding section 21. State of Alaska v. Andrus, 429 F.Supp. 958. D.Alaska.1977. Game ⟜ 6

### 20. National parks

Congress was not required to act pursuant to enumerated powers in creating national parks but was empowered to retain ownership of Alaska lands instead; indeed, it had power to retain federal land for public purposes under property clause. U.S. v. Vogler, C.A.9 (Alaska) 1988, 859 F.2d 638, certiorari denied 109 S.Ct. 787, 488 U.S. 1006, 102 L.Ed.2d 779. United States ⟜ 57

### 21. Fixtures and improvements

While Alaska law concerning fixtures might have been helpful as a guide in determining what was a permanent improvement, substance of federal law, rather than state improvements on submerged land was exempt from taxation under Alaska Native Townsite Act and Alaska Native Allotment Act were matters of federal law; state could not remove tax immunity by applying a narrow definition of fixtures or improvements to Native-owned property. Alaska Native Claims Settlement Act, §§ 2-31, 43 U.S.C.A. §§ 1601-1628, Alaska Statehood Act, § 4, 48 U.S.C.A. preceding section 21. People of South Naknek v. Bristol Bay Borough, 466 F.Supp. 870. D.Alaska.1979. Taxation ⟜ 2063

### 22. Aboriginal rights—In general

Various responsibilities impose fiduciary duties upon United States with respect to Indians, including duties so to regulate as substantive uses of Indian communities to preserve such communities as distinct cultural entities against interference by the states. Marine Mammal Protection Act of 1972, §§ 2 et seq., 101, 101(a)(1, 2), (b), 103(b)(5), 109, 109(a)(1, 2), (d), 16 U.S.C.A. §§ 1361, 1361, 1371(a)(1, 2), (b), 1373(b)(5), 1379, 1379(a)(1, 2), (d), 1383, U.S.C.A.Const. art. 6, cl. 2; Endangered Species Act of 1973, §§ 2 et seq., 10(e)(1), 16 U.S.C.A. §§ 1531 et seq., 1539(e)(1); Alaska Statehood Act, § 6, 48 U.S.C.A. preceding section 21; 48 U.S.C.A. § 248 et seq. Federal ...

of Togiak v. U.S., 470 F.Supp. 423. D.D.C.1979. Indians ⟜ 144; Indians ⟜ 351

Aboriginal title, as opposed to Indian title recognized by treaty or reservation, is legally extinguishable when the United States makes an otherwise lawful conveyance of land pursuant to federal statute. Alaska Native Claims Settlement Act, § 2 et seq., 43 U.S.C.A. § 1601 et seq.; Alaska Statehood Act, § 1 et seq., 48 U.S.C.A. preceding section 21. U.S. v. Atlantic Richfield Co., 435 F.Supp. 1009. D.Alaska.1977. Public Lands ⟜ 3

Intent of Congress in enacting Alaska Native Claims Settlement Act was to settle all claims of Alaska natives and compensate them, without deciding question of existence and extent of aboriginal title to Alaska lands; hence, since Treaty of Cession and Congressional legislation, including Statehood Act, preceding the Settlement Act incidentally affected native land but did not purport to settle aboriginal claims or to native land claims, it was appropriate to look directly to Settlement Act to discern congressional intent with respect to settlement and extinguishment of claims based on aboriginal title. Alaska Native Claims Settlement Act, § 2 et seq., 43 U.S.C.A. § 1601 et seq.; Alaska Statehood Act, § 1 et seq., 48 U.S.C.A. preceding section 21; Treaty of Cession, 15 Stat. 539. U.S. v. Atlantic Richfield Co., 435 F.Supp. 1009. D.Alaska.1977. United States ⟜ 105

Rights held and reserved for Indians under Alaska Statehood Act are rights pursuant to the Act proclamation, and need not be distinguished. Alaska Native Townsite Act and Alaska Native Allotment Act May 17, 1884, § 8, 23 Stat. 26; Alaska Statehood Act, § 4, 48 U.S.C.A. preceding section 21. U.S. v. State of Alaska, 197 F.Supp. 834. D.Alaska.1961. Indians ⟜ 151

### 23. Aboriginal lands, generally, aboriginal rights

Purpose of provision of Alaska Native Claims Settlement Act that all conveyances pursuant to the Act are subject to valid existing rights and that patents issued under the Act are subject to preexisting rights, such as those who entered the North Slope in reliance on federal authorization. Alaska Native Claims Settlement Act, §§ 4(a), 14(g), 22, 43 U.S.C.A. §§ 1603(a), 1613(g). Alaska Statehood Act, § 6(g), 48 U.S.C.A. preceding section 21. U.S. v. Atlantic Richfield Co., 435 F.Supp. 1009. D.Alaska.1977. United States ⟜ 105

## ALASKA STATEHOOD ACT

### Note 23

Alaska Native Claims Settlement Act eliminated any basis for native claims relating to pre-Settlement Act entries on land tentatively approved to the state under the Statehood Act or previously conveyed to private parties; hence, Settlement Act required dismissal of claims for entries under state leases pursuant to the Statehood Act or entries pursuant to valid federal leases or conveyances. Alaska Native Claims Settlement Act §§ 4(a, c), 43 U.S.C.A. § 1603(a, c); Alaska Statehood Act, § 4, 48 U.S.C.A. preceding section 21; U.S. v. Atlantic Richfield Co., 435 F.Supp. 1009, D.Alaska,1977. United States ⇐ 105

The State of Alaska did not have standing as an aggrieved party to appeal determinations made by the area director of the Alaska Bureau of Indian Affairs in respect to aboriginal land claims of native villages under the Alaska Native Claims Settlement Act where the State's only interest was the speculative possibility that at some later time for some undisclosed reason it might, under the Alaska Statehood Act, seek to select some unspecified part of land occupied by villages. Alaska Statehood Act, 48 U.S.C.A. preceding section 21; Alaska Native Claims Settlement Act, § 3(e), 43 U.S.C.A. § 1602(e). Kaning, Inc. v. Kleppe, 405 F.Supp. 1360, D.D.C.,1975. United States ⇐ 171

Characterization by United States Supreme Court of rights of Alaskan natives in lands claimed on basis of use and occupancy as being those of "mere possession" as opposed to "ownership" should not preclude Natives from maintaining an ordinary tort action for trespass to land and suing damages actually extracted from lands of any resources actually extracted from lands by trespassing third parties. Alaska Native Claims Settlement Act, §§ 4(a, c), 43 U.S.C.A. § 1603(a, c); Alaska Statehood Act, §§ 4, 6 as amended 48 U.S.C.A. preceding section 21; U.S.C.A.Const. Amend. 5. Edwardsen v. Morton, 369 F.Supp. 1359, D.D.C.,1973. Indians ⇐ 199; Indians ⇐ 171

Although rights of Alaskan natives to use and occupancy of aboriginal lands, safeguarded against diminution of native rights by third parties, are vulnerable to unconquenched congressional intent, on basis of which such rights could be wiped out at any time, until that time, though such rights acts, rights remain intact as an encumbrance on

the fee, and until an authorized transfer of title takes place, fee remains in the United States. Alaska Native Claims Settlement Act, §§ 4(a, c), 43 U.S.C.A. § 1603(a, c); Alaska Statehood Act, §§ 4, 6(a, b, g) as amended 48 U.S.C.A. preceding section 21; U.S.C.A.Const. Amend. 5. Edwardsen v. Morton, 369 F.Supp. 1359, D.D.C.,1973. Indians ⇐ 173

A fiduciary duty has been placed upon federal government and its agents to protect interests of Alaskan natives in lands claimed on basis of use and occupancy. Alaska Native Claims Settlement Act, § 4(a, c), 43 U.S.C.A. § 1603(a, c); Alaska Statehood Act, §§ 4, 6 as amended 48 U.S.C.A. preceding section 21. Edwardsen v. Morton, 369 F.Supp. 1359, D.D.C.,1973. Indians ⇐ 151

Possessory rights of Alaskan natives in aboriginal lands on basis of use and occupancy guarantee occupants protection from intrusions rather than a share in vendable interests in lands. Alaska Native Claims Settlement Act, §§ 4(a, c), 43 U.S.C.A. § 1603(a, c); Alaska Statehood Act, §§ 4, 6 as amended 48 U.S.C.A. preceding section 21. Edwardsen v. Morton, 369 F.Supp. 1359, D.D.C.,1973. Indians ⇐ 171

Congress did not intend by its enactment of Statehood Act to either enlarge or diminish possessory rights of Alaskan natives in aboriginal lands existing at time Act was passed. Alaska Statehood Act, §§ 4, 6(a, b, g) as amended 48 U.S.C.A. preceding section 21. Edwardsen v. Morton, 369 F.Supp. 1359, D.D.C.,1973. Indians ⇐ 151

Statehood Act must be construed as barring approval of state selections by the Secretary of Interior which would result in transferring out of "the absolute jurisdiction and control of the United States" property to which natives held by Alaskan natives or held by the United States for such natives. Alaska Statehood Act, §§ 4, 6(a, b, g) as amended 48 U.S.C.A. preceding section 21. Edwardsen v. Morton, 369 F.Supp. 1359, D.D.C.,1973. Indians ⇐ 171

Provision of Alaska Statehood Act that all patented land or other property would remain under absolute jurisdiction and control of United States did not preclude state from enforcing its hunting regulations against Alaska natives. Alaska Statehood Act, Art. 12, § 12, Alaska State, Const. Art. 12, § 12; Alaska Statehood Act, § 4, 48 U.S.C.A. prec. 21. McDowell v. State, 936 P.2d 1263, Alaska.App.,1997. Indians ⇐ 353

### Note 24 — Submerged lands, aboriginal rights

Provision of Alaska Statehood Act disclaiming all right and title to property which would be held by any natives, or to property held by the United States in trust for natives, was too general to give rise to inference of intent by Congress to defeat Alaska's equal footing entitlement to ownership of lands submerged beneath navigable waters. State of Alaska v. Ahtna, Inc., C.A.9 (Alaska) 1989, 891 F.2d 1401, certiorari denied 110 S.Ct. 1949, 495 U.S. 919, 109 L.Ed.2d 312. Navigable Waters 36(1) Administrative Law And Pro 36(1)

Injury, sufficient to support standing of environmental groups challenging policy of Bureau of Land Management of excluding submerged lands from amount of acreage charged against Alaska's entitlement, and Alaskan natives entitlement, could occur before total number of acres conveyed exceeded statutorily granted limit; coselection and prioritization made in intersection and prioritization of natural resources significantly different from selection for the recreational use. Alaska Statehood Act, § 1 et seq., 48 U.S.C.A. prec. § 21; Alaska National Interest Lands Conservation Act, § 906(o), 43 U.S.C.A. § 1635(o). Wilderness Soc. v. Morton, 824 F.2d 4 C.A.D.C.,1987. Administrative Law And Procedure ⇐ 668; United States ⇐ 113

Environmental groups lacked standing to bring action challenging policy of Bureau of Land Management to exclude submerged lands from amount of acreage charged against states's entitlement since groups, since groups or natives's members that its members failed to assert specific lands that its members intended to visit and either had been or would be shifted from federal to state or native ownership, notwithstanding group's assertion that policy would result in lower public lands members used in area where there was insufficient showing that members were threatened with injury. Alaska Statehood Act, § 1 et seq., 48 U.S.C.A. prec. § 21; Alaska National Interest Lands Conservation Act, § 906(o), Wilderness Soc. v. Morton, 824 F.2d 4, C.A.D.C.,1987. Administrative Law And Procedure ⇐ 668; United States ⇐ 113

Question of whether state or native ownership of land was more likely to injure environmental groups than federal ownership was factor to be considered as if threatened "personal injury" sufficient to confer standing on those who challenge Bureau of Land Management policy; inquiry as to whether injury resulting to groups was traceable to Bureau's policy of excluding submerged land grants, and whether order binding Bureau would likely cure groups' harm. Alaska Statehood Act, § 1 et seq., 48 U.S.C.A. prec. § 21; Alaska National Interest Lands Conservation Act

63

62

Act, § 2 et seq., 43 U.S.C.A. § 1601 et seq.; 5 U.S.C.A. § 702. Wilderness Soc. v. Griles, 824 F.2d 4, C.A.D.C. 1987. Administrative Law And Procedure ⚷ 668; United States ⚷ 113

Any injury from impaired use and enjoyment of land transferred from federal government to state or natives under statutory land grant would be fairly traceable to policy triggering transfer, and court order reinstating previous Bureau of Land Management policy changing submerged lands against state's or natives' grants would be likely to redress injury to environmental groups, thus satisfying "causation" requirement with regard to groups' standing to contest change in Bureau policy which did not change selected submerged lands against the grants. Alaska Statehood Act, § 1 et seq., 48 U.S.C.A. prec. § 21; Alaska Native Claims Settlement Act, § 2 et seq., 43 U.S.C.A. § 1601 et seq.; 5 U.S.C.A. § 702. Wilderness Soc. v. Griles, 824 F.2d 4, C.A.D.C. 1987. Administrative Law And Procedure ⚷ 668; United States ⚷ 113

Environmental groups, contesting Bureau of Land Management policy excluding submerged lands from amount of acreage chargeable against statutory land grants to state and native groups and seeking to protect their interests in enjoying "natural, scenic, historic [and other] values" of Alaskan wilderness, were within "zone of interests" to be protected by statutes governing such grants, for standing purposes. Alaska Statehood Act, § 1 et seq., 48 U.S.C.A. prec. § 21; Alaska National Interest Lands Conservation Act, § 101 et seq., 16 U.S.C.A. § 3101 et seq.; Alaska Native Claims Settlement Act, § 2 et seq., 43 U.S.C.A. § 1601 et seq. Wilderness Soc. v. Griles, 824 F.2d 4, C.A.D.C. 1987. Administrative Law And Procedure ⚷ 668; United States ⚷ 113

Under federal law, ownership and control of land under navigable waters in Alaska is confirmed in the state. Alaska Native Claims Settlement Act, § 11(b), 43 U.S.C.A. § 1610(b); Submerged Lands Act, § 2 et seq., 43 U.S.C.A. § 1301 et seq.; U.S.C.A. §§ 1301 et seq., 1311(a)(1), (e); Alaska Statehood Act, §§ 1 et seq., 6(m), 48 U.S.C.A. preceding section 21; AS 44.03.020. Alaska Public Easement Defense Fund v. Andrus, 435 F.Supp. 664, D.Alaska, 1977. Evidence ⚷ 10(4)

Under federal law, ownership and control of land under navigable waters in Alaska is confirmed in the state. Alaska Native Claims Settlement Act, § 11(b), 43 U.S.C.A. § 1610(b); Submerged Lands Act, § 2 et seq., 43 U.S.C.A. § 1301 et seq.; U.S.C.A. §§ 1301 et seq., 1311(a)(1), (e); Alaska Statehood Act, §§ 1 et seq., 6(m), 48 U.S.C.A. preceding section 21; AS 44.03.020. Alaska Public Easement Defense

Fund v. Andrus, 435 F.Supp. 664, D.Alaska, 1977. Navigable Waters ⚷ 36(1)

### 25. Hunting, fishing, aboriginal rights

Word "absolute" in section of Alaska Statehood Act by which Alaska disclaimed all right and title to and United States retained absolute jurisdiction and control over any lands or other property, including fishing rights, held by any Indians, Eskimos, or Aleuts or held by United States for their use, meant exclusive as distinguished and not non-exclusive. Alaska Statehood Act, § 4, 48 U.S.C.A. preceding section 21. Organized Village of Kake v. Egan, 82 S.Ct. 562. U.S.Alaska,1962. Indians ⚷ 363; Indians ⚷ 360

Alaska Statehood Act retaining absolute jurisdiction and control of Indian property, including fishing rights, in United States, did not authorize Secretary of Interior to issue regulations authorizing certain Indian communities to operate fish-traps in Alaska waters in violation of state law. Alaska Anti-Fish-Trap Conservation Law, §§ 476, 477; 25 U.S.C.A. § 473a; Alaska Statehood Act, § 1 et seq., 48 U.S.C.A. preceding section 21; Laws Alaska 1959, c. 17 as amended by c. 95. Organized Village of Kake v. Egan, 82 S.Ct. 562. U.S.Alaska,1962. Indians ⚷ 363; Fish ⚷ 3.5

Section of Alaska Statehood Act by which Alaska disclaimed all rights and title to and United States retained absolute jurisdiction and control over any lands or other property, including fishing rights, held by any Indians or held by United States in trust for them does not itself authorize Indian communities to operate fish-traps in Alaska waters in violation of Alaska Anti-Fish-Trap Conservation Law. Alaska Statehood Act, § 4, 48 U.S.C.A. preceding section 21; Laws Alaska 1959, c. 17 as amended by c. 95. Organized Village of Kake v. Egan, 82 S.Ct. 562. U.S.Alaska,1962. Indians ⚷ 365

Alaska Statehood Act retaining absolute jurisdiction and control of Indian property, including fishing rights, in United States, did not authorize Secretary of Interior to issue regulations authorizing Metlakatla Indian Community to operate fish-traps in Alaska waters surrounding their reservation. Alaska Statehood Act, § 4 et seq., 48 U.S.C.A. preceding § 21; 48 U.S.C.A. § 358. Metlakatla Indian Community, Annette Islands Reserve v. Egan, 82 S.Ct. 552. U.S.Alaska,1962. Indians ⚷ 365

S.Ct. 552. U.S.Alaska,1962. Federal Courts ⚷ 513

Section of Alaska Statehood Act requiring Alaska to disclaim all right and title to any United States property not granted Alaska by statute, and also any lands which may be held by Indians, Eskimos, or Aleuts, or is held by United States in trust for natives preserved federal authority over reservation on Annette Islands but not over other Indian and Eskimo lands of southeastern Alaska for sole purpose of protecting native interests. Alaska Statehood Act, § 21. Metlakatla Indian Community, Annette Islands Reserve v. Egan, 82 S.Ct. 552. U.S.Alaska,1962. Indians ⚷ 157; Indians ⚷ 363

Section of Alaska Statehood Act providing for sole purpose of United States protection of conservation and protection of fisheries and wildlife of Alaska contemplated transfer to Alaska of same measure of administration and jurisdiction over fisheries and wildlife as possessed by other states. Alaska Statehood Act, § 6(e), 48 U.S.C.A. preceding § 21; Metlakatla Indian Community, Annette Islands Reserve v. Egan, 82 S.Ct. 552. U.S.Alaska,1962. Fish ⚷ 3; Game ⚷ 3.5

Section of Alaska Statehood Act providing for conveyance of United States properties used for sole purpose of conservation and protection of fisheries and wildlife of Alaska contemplated transfer to Alaska of same measure of administration and jurisdiction over fisheries and wildlife as possessed by other states. Alaska Statehood Act, § 6(e), 48 U.S.C.A. preceding § 21. Metlakatla Indian Community, Annette Islands Reserve v. Egan, 82 S.Ct. 552. U.S.Alaska,1962. Fish ⚷ 3; Game ⚷ 3.5

Where Secretary of Interior, in promulgating regulations according Metlakatla Indian Community right to erect and operate salmon traps in waters surrounding Annette Islands, acted under 1891 statute, in conferring such authority, instead of under 1891 statute, would vacate judgment of Alaska Supreme Court adverse to Metlakatla Indian Community and remand case to give ample opportunity for Secretary to exercise discretion he should choose to exercise. 48 U.S.C.A. § 358. Alaska Statehood Act, § 4 preceding section 21; White Act, 48 U.S.C.A. §§ 221-228. Metlakatla Indian Community, Annette Islands Reserve v. Egan, 82 S.Ct. 552. U.S.Alaska,1962. Indians ⚷ 365

The Secretary of the Interior is without authority to except fish traps of plaintiff Indian communities from an order prohibiting the use of fish traps in Alaskan waters and the State of Alaska had authority to prohibit all fish traps in Alaskan waters, including those of the plaintiffs. White Act, § 1 as amended 48 U.S.C.A. § 221; Alaska Statehood Act, § 6(e), 48 U.S.C.A. preceding section 23. Organized Village of Kake v. Egan, 80 S.Ct. 33. U.S.Alaska,1959.

Where Alaska enacted statute making it a crime to erect or maintain fish traps and Secretary of Interior subsequently made a regulation permitting trapping against them and villages intended which fish-trapping shown viability was solely dependent on fishing and canning operations, and District Court for District of Alaska denied villages an injunction prohibiting enforcement of statute against them until prohibited fishing season had expired, and irreparable injury affecting Indian communities would be sustained if they were not permitted to engage in trap fishing, equity supported application for an order restraining state and its Governor and agents of the state from interfering with villages' operation of fish traps pending hearing in Supreme Court, from interfering with villages' attempts to erect, maintain and operate fish traps and to restrain enforcement of statute against them, and questions proposed to be presented to Supreme Court for review were not so difficulty that there was a substantial prospect that they would command four votes for review. 48 U.S.C.A. §§ 221, 222; Alaska Statehood Act, §§ 1 et seq., 6(e), 48 U.S.C.A. note preceding section 21; c. 17, S.L.A. 1959; Const.Alaska, art. 12, § 12. Organized Village of Kake v. Egan, 80 S.Ct. 33. U.S.Alaska,1959. Injunction ⚷ 138.48; Federal Courts ⚷ 446

Alaska Statehood Act allows state to regulate off-reservation hunting and fishing unless Congress enacts statute to limit state's authority. Alaska Statehood Act, §§ 1 et seq., 4, 48 U.S.C.A. preceding section 21. Nance v. Egan, 936 P.2d 1263. Alaska,1997. Indians ⚷ 353; Indians ⚷ 363

Provision of Alaska Omnibus Act dealing with Indian fishing rights and amending provision of Alaska Statehood Act formed no part of compact between Alaska and United States, where act was not enacted until 10 months after voters of Alaska ratified compact and 6 months after voters of Alaska attained statehood. Alaska Statehood Act, § 4 as amended by Alaska Omnibus Act, § 2(a), 48 U.S.C.A. preceding section 21; Const. art. 1 § 10. Regiekuta v. State, 362 P.2d 901. Alaska,1961. States ⚷ 4.1(2)

No compact as to fishing rights of Alaska Indians was formed between State of Alaska Indians and United States by Alaska Constitution and Alaska Statehood Act, and therefore Indians were not exempt from Alaska law prohibiting use of fish traps. Metlakatla Indian Community v. Egan, 362 F.2d 901, U.S.C.A. preceding section 21; Laws 1959, c. 17; Ordinance No. 3, Laws 1959, p. 54; Const. Art. 12, § 12. Metlakatla Indian Community, Annette Island Reserve v. Egan, 362 P.2d 901, Alaska 1961.

No act of Congress had established any right or title in fishing rights for Alaska Indians at time compact between United States and Alaska for admission of Alaska to statehood was made, and hence Alaska law prohibiting operation of fish traps was applicable to Indians. Alaska Statehood Act, §§ 1, 4, 6(e), 8(c), 48 U.S.C.A. preceding section 21; Laws 1959, c. 17. Ordinance No. 3, Laws 1959, p. 54; Const. Art. 8, § 15. Metlakatla Indian Community, Annette Island Reserve v. Egan, 362 P.2d 901. Alaska, 1961. Fish ⟨⟩ 8; Indians ⟨⟩ 365

Congress intended that control by Secretary of the Interior over fish in Alaska should be transferred to State of Alaska as soon as it was prepared to assume responsibility, and therefore Alaska Indians were not excepted from operation of Alaska law prohibiting use of fish traps because use of fish traps by Indians had been authorized by Secretary of the Interior. Alaska Statehood Act, §§ 1, 4, 6(e), 8(c), 48 U.S.C.A. preceding section 21; Laws 1959, c. 17. Ordinance No. 3, Laws 1959, p. 54; Const. Art. 8, § 15. Metlakatla Indian Community, Annette Island Reserve v. Egan, 362 P.2d 901. Alaska, 1961. Fish ⟨⟩ 8

Alaska territorial game laws and acts regulating commercial fisheries continued in force on admission of Alaska as a state, but were modified by Alaska law providing taxing of all fish for taking of salmon for commercial purposes and by section of Constitution providing that no exclusive right or special privilege of fisheries shall be created or authorized in natural waters of State. Alaska Statehood Act, §§ 6(d), 8(d), 48 U.S.C.A. preceding section 21; Const. Art. 8, § 15. Ordinance No. 3, Laws 1959, p. 54. Metlakatla Indian Community, Annette Island Reserve v. Egan, 362 P.2d 901. Alaska, 1961.

**26.——— Taxation, aboriginal rights**

Land held in trust under either the Alaska Native Townsite Act or Alaska Native Allotment Act is exempt from local and state taxation: beneficial interest of the natives in land within a Native townsite and within a Native allotment cannot be taxed by the state or local government. 43 U.S.C. (1970 Ed.) §§ 270-1, 733; Alaska Native Claims Settlement Act, §§ 2-31, 43 U.S.C.A. §§ 1601-1628; Alaska

Statehood Act, § 4, 48 U.S.C.A. preceding section 21. People of South Naknek v. Bristol Bay Borough, 466 F.Supp. 870. D.Alaska,1979. Municipal Corporations ⟨⟩ 956(1)

Not only may land held in trust for Alaskan natives under either the Native Townsite Act or Native Allotment Act not be taxed by state or local government, the exemption extends as well to houses and other improvements affixed to such land. 43 U.S.C. (1970 Ed.) §§ 270-1, 733; Alaska Native Claims Settlement Act, §§ 2-31, 43 U.S.C.A. §§ 1601-1628. Alaska Statehood Act, § 4, 48 U.S.C.A. preceding section 21. People of South Naknek v. Bristol Bay Borough, 466 F.Supp. 870. D.Alaska,1979. Municipal Corporations ⟨⟩ 967(1); Taxation ⟨⟩ 242(1)

Bristol Bay Borough, Alaska, was preempted from taxing the land, homes, or other permanent improvements on restricted land held in trust for Alaska natives, by express provision of Alaskan natives in the village of South Naknek, Alaska. 43 U.S.C. (1970 Ed.) §§ 270-1, 733; Alaska Native Claims Settlement Act, §§ 2-31, 43 U.S.C.A. §§ 1601-1628. Alaska Statehood Act, § 4, 48 U.S.C.A. preceding section 21. People of South Naknek v. Bristol Bay Borough, 466 F.Supp. 870. D.Alaska,1979. Municipal Corporations ⟨⟩ 956(1)

Neither Alaska Native Allotment Act nor Alaska Native Townsite Act preempt an Alaska borough's taxation of personal property associated with land and/or real property held in trust for Alaska natives, and the taxes on those Acts. 43 U.S.C. (1970 Ed.) §§ 270-1, 733; Alaska Native Claims Settlement Act, §§ 2-31, 43 U.S.C.A. §§ 1601-1628; Alaska Statehood Act, § 4, 48 U.S.C.A. preceding section 21. People of South Naknek v. Bristol Bay Borough, 466 F.Supp. 870. D.Alaska,1979. Municipal Corporations ⟨⟩ 956(1)

Provision of Alaska Statehood Act that native property held in trust by United States "shall be and remain under the absolute jurisdiction and control of the United States" does not mean exclusive jurisdiction, and, hence, such provision is not a prohibition on state and local taxation of personal property associated with either an Alaskan native allotment or an Alaskan native townsite. 43 U.S.C. (1970 Ed.) §§ 270-1, 733; Alaska Native Claims Settlement Act, §§ 2-31, 43 U.S.C.A. §§ 1601-1628; Alaska Statehood Act, § 4, 48 U.S.C.A. preceding section 21. People of South Naknek v. Bristol Bay Borough, 466 F.Supp. 870. D.Alaska,1979. Municipal Corporations ⟨⟩ 956(1); Taxation ⟨⟩ 2063

Borough of Bristol Bay, Alaska, was not prohibited from taxing personal property associated with either an Alaskan native allotment or an Alaskan native townsite. 43 U.S.C. (1970 Ed.) §§ 270-1, 733; Alaska Native Claims Settlement Act, §§ 2-31, 43 U.S.C.A. §§ 1601-1628; Alaska

preceding section 21; Laws Alaska 1959, c. 50, §§ 31, 32. U.S.C.A.Const. art. 3, § 1. U.S. v. Egelak, 173 F.Supp. 206. D.Alas-ka.Terr.2.Div.,1959. Courts ⟨⟩ 42(1); Taxation ⟨⟩ 9

Section 1 of Article III of the federal Constitution relates only to federal courts; and there was no merit to contention that Congress could not create courts within state other than in conformity therewith. Alaska Statehood Act, § 18, 48 U.S.C.A. preceding section 21; Laws Alaska 1959, c. 50, §§ 31, 32. U.S.C.A.Const. art. 3, § 1. U.S. v. Egelak, 173 F.Supp. 206. D.Alas-ka.Terr.2.Div.,1959. Courts ⟨⟩ 42(1)

Provision of Alaska Statehood Bill specifying that sections respecting termination of jurisdiction of District Court for Territory of Alaska shall not be effective until three years after they were filed, provide for orderly transition in assumption by state of new transitional period, and during an interim period when Territory of Alaska shall continue to function as heretofore, is not unconstitutional on ground that it violates constitutional provision giving federal judges tenure during good behavior, that it violates constitutional provision for sole purpose of conservation and protection of federal Constitution that it constitutes a denial of process of law. U.S.C.A.Const. art. 3, § 1, art. 4, § 2; Amend. 5. Alaska Statehood Act, § 18, 48 U.S.C.A. preceding section 21. U.S. v. Star-U.S.C.A. note preceding section 21. U.S. v. Star-ling, 171 F.Supp. 47. D.Alas.Terr.3.Div.,1959. ling, 171 F.Supp. 47. D.Alas.Terr.3.Div.,1959. Judges ⟨⟩ 2950; Constitutional Law ⟨⟩ 4559; Judges ⟨⟩ 7; Federal Courts ⟨⟩ 1023

Functioning courts in Alaska after proclamation of statehood are legislative in character. 48 U.S.C.A. §§ 101, 48 U.S.C.A.Const. art. 3, § 1. Alaska Statehood Act, § 18, 48 art. 3, Alaska Statehood Act, § 18, 48 U.S.C.A. note preceding section 21. U.S. v. Star-Boundary Commission, 518 P.2d 92. Alas-ka,1974. United States ⟨⟩

In prosecution for violation of state law, institution over naval petition were No. 4 until Congress had no jurisdiction to the contrary. AS 22.10.020; Alaska Statehood Act, § 18, 48 U.S.C.A. preceding section 21. Mobil Oil Corp. v. Local Boundary Commission, 518 P.2d 92. Alas-ka,1974. United States ⟨⟩ 1023

State has been granted concurrent jurisdiction over naval petition reserve No. 4 until tted and concluded after Alaska became a state court system, it was proper, under state constitution and under statehood act, that United States be named as plaintiff in indictment and that prosecution be carried out. Art. 15, § 17, Alaska Statehood Act, § 18, 48 U.S.C.A. preceding section 21; Laws Alaska 1959, c. 50, § 102] as amended by c. 151, § 2; A.C.L.A.1949, § 66-1-14; 43

**27.——— Courts and judiciary—Continuation of actions**

Statehood Act, § 4, 48 U.S.C.A. preceding section 21. People of South Naknek v. Bristol Bay Borough, 466 F.Supp. 870. D.Alaska,1979. Municipal Corporations ⟨⟩ 956(1)

**28.——— Judicial jurisdiction, courts and judiciary**

The Alaska Statehood Act (ASA) expressed congressional intent to retain submerged lands underlying the waters of Glacier Bay in Alaska as part of a federal reservation, rebutting the presumption, under the equal footing doctrine and the submerged lands under the Glacier Bay National Park, which later became Glacier Bay National Park, were created to preserve merged lands directed transfer to Alaska of any United States property used for sole purpose of conservation and protection of federal wildlife refuge, wildlife as identified under clause as identified under the statute, but provision after clause several wildlife laws; the transfer did not apply to presidentially withdrawn or otherwise set apart as refuges or wildlife reservations, and the submerged lands under Glacier Bay at the Glacier Bay National Park, which were created to preserve Bay National, which was created to preserve this Alaska wildlife. Alaska v. U.S., U.S. 20205, 125 S.Ct. 2137, 545 U.S. 75, 162 L.Ed.2d 57, entered 126 S.Ct. 1023 Navigable Waters 36(1) Navigable Waters 36(1). Navigable Waters 36(1)

Congress set out as a note pres. § 21 of Title 48] granted to a state of Alaska concurrent jurisdiction with the United States over the No. 4 braced within Naval Petroleum of those contained in executive order and this section, until retained jurisdiction to contrary. Petition of Long, D.C.Alaska 1961, 200 F.Supp. 313. Criminal Law ⟨⟩ 97(4)

By legislation providing system of Supreme and Superior Courts, state legislature of Alaska declared its intent to exempt present courts and declared with jurisdiction until state courts were established; and in face of such declaration, it could not be successfully contended that Congress had "imposed" judicial state. Alaska Statehood Act, § 18, 48 U.S.C.A.

**Note 28**

**ALASKA STATEHOOD ACT**

**Note 33**

U.S.C.A. § 109. Oxenberg v. State, 362 P.2d 893, Alaska, 1961. States ⟨⟩ 9

Congress did not reject Alaska's proposal to use federal courts in its own were organized by requiring that such courts were to remain in use for three years unless President sooner proclaimed that United States District Court for Alaska was prepared to assume its functions. Alaska Statehood Act, § 18, 48 U.S.C.A. preceding § 21; A.C.L.A.Supp. § 52A-1-31, Hobbs v. State, 359 P.2d 956, Alaska,1961. Courts ⟨⟩ 42(1)

No arbitrary reservation by Congress to President of power of determining when newly organized state courts could assume jurisdiction was involved in provision that interim courts should remain in use for three years unless President sooner proclaimed that United States District Court for District of Alaska was prepared to assume its functions. Alaska Statehood Act, § 18, 48 U.S.C.A. preceding § 21; A.C.L.A.Supp. § 52A-1-31, Hobbs v. State, 359 P.2d 956, Alaska,1961. Constitutional Law ⟨⟩ 2623; Courts ⟨⟩ 42(1)

**29. — Territorial courts, courts and judiciary**

Segregation of judicial territorial court records did not occur in the manner provided for in the Alaska Statehood Act, and while the Alaska Archives and Records and the National Archives and Records Administration are in agreement that it would be impractical to do as it this time, some type of agreement should be pursued to determine permanent disposition. Alaska Op.Atty.Gen. 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, (March 10, 1994) 1994 WL 106740.

**30. — Transition, courts and judiciary**

Alaska Enabling Act contemplated, for period of three years or less, that old territorial court would perform as before, handling state cases as well as federal. Alaska Statehood Act, § 1 et seq., 48 U.S.C.A. preceding section 23; Mahlum v. Carlson, 304 F.2d 285, C.A.9 Alaska,1962. Federal Courts ⟨⟩ 146

Provision in Alaska Enabling Act that territorial court was to continue on for three years or less, under provisions, handling federal cases was constitutional as to all federal cases other than criminal cases pending on date Alaska became state. Alaska Statehood Act, § 1 et seq., 48 U.S.C.A. preceding section 23; Mahlum v. Carlson, 304 F.2d 285, C.A.9 Alaska,1962. Federal Courts ⟨⟩ 146

United States District Courts for Territory of Alaska having continuing federal jurisdiction over criminal and civil matters arising under laws of United States during three-year transitional period when Alaska advances from territorial to full state status or until President by executive order shall proclaim that the United

States District Court for the District of Alaska is prepared, such functions imposed on it, jurisdiction actions are vested in it. Alaska Statehood Act, § 1 et seq., 48 U.S.C.A. preceding section 23. U.S. v. Starling, 171 F.Supp. 47, D.Alaska.Terr.3.Div.,1959. Federal Courts ⟨⟩ 1023 ‥

**31. — Interim courts, courts and judiciary**

Interim Alaska District Court was not intended by Statehood Act to be the newly created United States District Court for the District of Alaska. Alaska Statehood Act §§ 12-18, 48 U.S.C.A. preceding section 23, 28 U.S.C.A. § 81A, Metkakila Indian Com. v Annette Island R. v. Egan, 80 S.Ct. 1321. U.S.,Alaska,1960. Federal Courts ⟨⟩ 146

Where Alaskan Legislature vested state judicial power in interim District Court for time being and district judge deemed himself to be assuming full power by judgment and consent of United States, interim District Court had authority to exercise jurisdiction and hence Dismining appellate jurisdiction of federal Supreme Court. 28 U.S.C.A. § 1257(3); Alaska Statehood Act §§ 12-18, 48 U.S.C.A. preceding section 23; Laws Alaska 1959, c. 50, § 1; Theodore v. Zurich General Acc. & Liability Ins. Co., 364 P.2d 51. Alaska,1961. Constitutional Law art. 4, §§ 1, 2; art. 15, §§ 17, 25, 32(4) as amended by Laws Alaska 1959. Courts ⟨⟩ 501

To insure timely appeal on constitutional question, where date for full organization of Alaskan courts was 2 1/2 years in future, interim District Court was considered the highest court of Alaska, for purpose of appellate jurisdiction of federal Supreme Court, even though, before action was commenced, the legislature had occurred conferring appellate jurisdiction on state's Supreme Court, and thereafter judges had been appointed and rules adopted. 28 U.S.C.A. § 1257(2); Alaska Statehood Act §§ 12-18, 48 U.S.C.A. preceding section 23; Laws Alaska, 1959, c. 50, § 1; 32(4) as amended by Laws Alaska 1959. Const.Alaska, art. 4, §§ 1, 2; art. 15, §§ 17, 25. Metkakila Indian Com. v. Annette Island R. v. Egan, 80 S.Ct. 1321. U.S.,Alaska,1960. Federal Courts ⟨⟩ 501

about status of jurisdiction of the interim court, which was on Alaska's territorial court. Alaska Statehood Act, § 1 et seq., 48 U.S.C.A. preceding section 21. Mahlum v. Carlson, 304 F.2d 285. C.A.9 Alaska,1962. Evidence ⟨⟩ 40

Where instructions were reduced to writing and sent to jury room and jury's copy was made part of record, and when it was not suggested that instruction read to jury differed in any respect from instruction sent to jury, defendant was not prejudiced by any error trial court committed in failing to record and transcribe reading of jury instructions at his 1959 trial before federal territorial court sitting as interim federal court. Alaska Statehood Act, § 1 et seq., 48 U.S.C.A. prec. § 21; 28 U.S.C.A. § 753(b); Rules U.S.Dist.Ct., Rule 210(k). Marrone v. State, 653 P.2d 672. Alaska.App.,1982. Criminal Law ⟨⟩ 1172.1(5)

Neither state courts nor federal court for district of Alaska having been vested or recognized with jurisdiction over pre-statehood judgment, commenced, action was properly commenced in interim district court, and even though case was determined by judgment entered on day before newly created federal court sitting as an interim federal court exclusively federal jurisdiction, case was still 'pending' then (because time for appropriate motions and appeal had not yet expired), and no petition for removal having been filed, appeal was properly taken to Alaska Supreme Court, notwithstanding that action was one within original jurisdiction of federal court. Const. art. 4, § 2; Alaska Statehood Act, § 16, 48 U.S.C.A. preceding section 21; 28 U.S.C.A. § 1446; Laws 1959, c. 50, § 1. Theodore v. Zurich General Acc. & Liability Ins. Co., 364 P.2d 51. Alaska,1961. Courts ⟨⟩ 501

United States Court for District (Territory) of Alaska, acting as interim transition court for period between admission of Alaska into Union and organization of its constitutional courts, had jurisdiction to try defendant for state offense of larceny in a building. Alaska Statehood Act, §§ 12-18, 48 U.S.C.A. preceding § 21; 23 Stat. 24 preceding ch.6, 1900, 31 Stat. 443; 28 U.S.C.A. § 1291;. Annette Island R. v. Egan, 80 S.Ct. 1321. U.S.Alaska,1960. Federal Courts ⟨⟩ 501

Libelant who procured, in territorial court which was continued to act as interim court under Alaska Enabling Act, decree in admiralty relating to sale of fishing boat, had no ground for having portion of effect of decree undone when sale proceeds were exceeded by items in cost bill, Alaska Statehood Act, §§ 1 et seq., 15, 48 U.S.C.A. preceding section 21. Mahlum v. Carlson, 304 F.2d 285. C.A.9,Alaska,1962. Admiralty ⟨⟩ 25

Court of Appeals would take judicial notice that, on date Alaska's statehood became effective, there was much concern throughout Alaska

though it was necessary for him to appeal to Supreme Court of Alaska rather than to Court of Appeals for Ninth Circuit, acting as interim transition court. Alaska Statehood Act, §§ 12(e), 13-18, 48 U.S.C.A. preceding § 21; A.C.L.A.Supp. § 52A-1-31, Hobbs v. State, 359 P.2d 956, Alaska,1961. Constitutional Law ⟨⟩ 3816; Constitutional Law ⟨⟩ 4765; Courts ⟨⟩ 421(1)

**32. — Federal courts and jurisdiction, courts and judiciary**

Alaska Statehood Enabling Act provisions transferring to federal district court for Alaska all federal cases 'pending' in territorial court at time of statehood, but continuing the territorial court until District Court was prepared to function, did not authorize transfer to District Court of criminal prosecutions begun in territorial court after statehood, and hence District court did not have jurisdiction to continue prosecution after termination of territorial court, and better practice would have been to reindict defendant. Alaska Statehood Act, §§ 1 et seq., Wooding v. U.S., 304 F.2d 308, C.A.9 Alaska,1962. Criminal Law ⟨⟩ 101(1)

Effect of Alaska Enabling Act is to generally restrict jurisdiction of United States court, of Appeals for the Ninth Circuit, on decisions or judgments rendered in Alaska after January 3, 1959, to those coming up from the newly created United States District Court for the District of Alaska and Court of Appeals did not have jurisdiction of proceeding for writ of prohibition or writ of mandamus to stop proceeding in third division of United States District Court for territory of Alaska wherein defendant, who had been indicted for larceny of fishing boat, theft of United States Government property. Proclamation Jan. 6, 1959, 48 U.S.C.A. preceding Stat., 48 U.S.C.A. preceding § 21; 48 U.S.C.A. preceding section 21; 48 U.S.C.A. § 101; Parker v. McCurley, 268 F.2d 907. C.A.9 Alaska,1959. Courts ⟨⟩ 489(U)

Federal jurisdiction is not exclusive, and state courts also have jurisdiction over cases between parties having diverse citizenship. Alaska Statehood Act, §§ 15, 16, U.S.C.A. preceding section 21; 28 U.S.C.A. § 1332. Theodore v. Zurich General Acc. & Liability Ins. Co., 364 P.2d 51. Alaska,1961. Courts ⟨⟩ 489(U)

**33. — Appeals, courts and judiciary**

Under Alaska Enabling Act, which provided that appeals taken before statehood was achieved should be prosecuted 'to final determination' as though Act had not been passed, cases in which judgment of United States District Court for the Territory of Alaska had been appealed to the United States Court of Appeals prior to statehood, could be remanded, in prop-

# Proclamation 3269

## Admission of the State of Alaska into the Union

### By the President of the United States of America
### A Proclamation

WHEREAS the Congress of the United States by the act approved on July 7, 1958 (72 Stat. 339), accepted, ratified, and confirmed the constitution adopted by a vote of the people of Alaska in an election held on April 24, 1956, and provided for the admission of the State of Alaska into the Union on an equal footing with the other States of the Union upon compliance with certain procedural requirements specified in that act; and

WHEREAS it appears from information before me that a majority of the legal votes cast at an election held on August 26, 1958, were in favor of each of the propositions required to be submitted to the people of Alaska by section 8 (b) of the act of July 7, 1958; and

WHEREAS it further appears from information before me that a general election was held on November 25, 1958, and that the returns of the general election were made and certified as provided in the act of July 7, 1958; and

WHEREAS the Acting Governor of Alaska has certified to me the results of the submission to the people of Alaska of the three propositions set forth in section 8 (b) of the act of July 7, 1958, and the results of the general election; and

WHEREAS I find and announce that the people of Alaska have duly adopted the propositions required to be submitted to them by the act of July 7, 1958, and have duly elected the officers required to be elected by that act:

NOW, THEREFORE, I, DWIGHT D. EISENHOWER, President of the United States of America, do hereby declare and proclaim that the procedural requirements imposed by the Congress on the State of Alaska to entitle that State to admission into the Union have been complied with in all respects and that the admission into the Union of the State of Alaska on an equal footing with the other States of the Union is now accomplished.

IN WITNESS WHEREOF, I have hereunto set my hand and caused the Seal of the United States of America to be affixed.

DONE at the City of Washington at one minute past noon on this third day of January in the year of our Lord nineteen hundred and fifty-nine, and of the Independence of the United States of America the one hundred and eighty-third.

Dwight D. Eisenhower

[Seal]

By the President:

Christian A. Herter,
*Acting Secretary of State.*

71

---

ALASKA STATEHOOD ACT

Note 33

er cases, to Supreme Court of Alaska. Laws 1949, c. 97, § 1 as amended by Laws 1951, c. 116, § 1; Alaska Statehood Act, §§ 14, 48 U.S.C.A. preceding section 21. 28 U.S.C.A. §§ 1331, 1332, Arctic Maid v. Territory of Alaska, 297 F.2d 28. C.A.9.Alaska,1961. Federal Courts ⊂⊐ 146

Under the Alaska Statehood Act, which provided for remand of federal cases which had been appealed prior to statehood or in which final judgment had been rendered, to either federal or state court "as the case may require", remand should be to court where case should have been commenced, had state and federal judicial systems, existing after statehood, been in effect when suits were instituted. Alaska Statehood Act, § 14, 48 U.S.C.A. preceding section 21. Arctic Maid v. Territory of Alaska, 297 F.2d 28. C.A.9.Alaska,1961. Federal Courts ⊂⊐ 146

Where actions for territorial taxes had been instituted by Territory of Alaska in United States District Court for the Territory of Alaska prior to Alaska statehood and where, following appeal to United States Court of Appeals and during progress of cases through Court of Appeals and United States Supreme Court, Alaska became a state, jurisdiction on remand for further proceeding lay in Supreme Court of Alaska in view of fact that neither federal question nor diversity of citizenship was involved. Laws 1949, c. 97, § 1 as amended by Laws 1951, c. 116, § 1; Alaska Statehood Act, § 14, 48 U.S.C.A. preceding section 21. 28 U.S.C.A. §§ 1331, 1332, Arctic Maid v. Territory of Alaska, 297 F.2d 28. C.A.9.Alaska,1961. Federal Courts ⊂⊐ 146

Where housing authority instituted condemnation proceedings, using declaration of taking, owner challenged right to use such by motion to strike declaration of taking and by motions at-

tacking summons and sufficiency of complaint, Supreme Court in review of proceedings determined that authority had no right to use condemnation and issued mandate directing trial court to take proceedings in conformity with opinion, trial court declined to dismiss action and owner petitioned for review, but property had been taken and buildings located thereon removed, so that any decision on balance of owner's motions would be fruitless, Supreme Court would direct dismissal of action. Alaska Statehood Act, § 16, 48 U.S.C.A. preceding section 23. Bridges v. Alaska Housing Authority, 352 P.2d 1118. Alaska,1960. Eminent Domain ⊂⊐ 263

Under the Alaska Statehood Act provisions by which appeal from District Court for Territory of Alaska in murder case was directed to Court of Appeals for Ninth Circuit and under which, in event of reversal, case would be remanded to state Supreme Court, it was intended that United States and state have concurrent interest and responsibility in such cases, and if state Supreme court had jurisdiction to issue writ of habeas corpus, Alaska Statehood Act, §§ 14, 15, 16, 48 U.S.C.A. preceding section 23. Application of House, 352 P.2d 131. Alaska,1960. Habeas Corpus ⊂⊐ 612.1

Under provisions of the Alaska Statehood Act, Supreme Court for State of Alaska had jurisdiction to revoke bail pending appeal from District Court for Territory of Alaska, in murder case, to United States Court of Appeals for Ninth Circuit, and executive order terminating jurisdiction of District Court for Territory of Alaska did not vest sole jurisdiction to revoke bail in Court of Appeals for Ninth Circuit. Alaska Statehood Act, §§ 14, 15, 16, 48 U.S.C.A. preceding section 23. Executive Order, U.S.Code Congressional and Administrative News 1960, p. 333, No. 10867. Application of House, 352 P.2d 131. Alaska,1960. Bail ⊂⊐ 77(1)

70

# *West's*
# ALASKA STATUTES ANNOTATED

## Treaty of Cession of 1867

Treaty of Cession of 1867

### Notes of Decisions

In general

When Russia ceded the territory of Alaska to the United States in 1867, the United States thereby acquired whatever dominion Russia had possessed over that territory. Alaska v. U.S. (2005) U.S., 125 S.Ct. 2137, 545 U.S. 75, 162 L.Ed.2d 57, entered 126 S.Ct. 1014, 546 U.S. 413, 163 L.Ed.2d 995. Water Law ⟨⟩ 2647

## Alaska Statehood Act

Alaska Statehood Act

### Notes of Decisions

16. Submerged lands—In general

United States did not transfer to Alaska offshore submerged lands within Arctic National Wildlife Range at statehood; pre-statehood application by Bureau of Sport Fisheries and Wildlife for withdrawal of lands included submerged lands, and United States retained Range under Alaska Statehood Act. Alaska Statehood Act, § 6(e), 48 U.S.C.A. prec. § 21; 43 C.F.R. § 295.11 (1958). U.S. v. Alaska (1997) U.S., 117 S.Ct. 1888, 521 U.S. 1, 138 L.Ed.2d 231, rehearing denied 118 S.Ct. 19, 521 U.S. 1144, 138 L.Ed.2d 1051. Water Law ⟨⟩ 2649

17. —— Rivers and navigable waters, submerged lands

United States retained ownership of submerged lands within National Petroleum Reserve-Alaska at Alaska's statehood; Executive Order creating Reserve reflected clear intent to include submerged lands, and Alaska Statehood Act reflected clear congressional statement that United States owned and would continue to own submerged lands. U.S. v. Alaska (1997) U.S., 117 S.Ct. 1888, 521 U.S. 1, 138 L.Ed.2d 231, rehearing denied 118

S.Ct. 19, 521 U.S. 1144, 138 L.Ed.2d 1051. Water Law ⟨⟩ 2649

28. —— Judicial jurisdiction, courts and judiciary

The Alaska Statehood Act (ASA) expressed Congressional intent to retain submerged lands underlying the waters of Glacier Bay in Alaska as part of a federal reservation, rebutting the presumption, under the equal footing doctrine and the Submerged Lands Act (SLA), that Alaska held title to those submerged lands; ASA clause directed transfer to Alaska of any United States property used for sole purpose of conservation and protection of Alaska's fisheries and wildlife as identified under three particular federal wildlife laws, but proviso after clause expressly stated that the transfer did not apply to lands withdrawn or otherwise set apart as refuges or wildlife reservations, and the submerged lands under Glacier Bay were set apart by the proclamations that created the Glacier Bay National Monument, which later became national park, which was created to preserve the nature and wildlife therein. Alaska v. U.S. (2005) U.S., 125 S.Ct. 2137, 545 U.S. 75, 162 L.Ed.2d 57, entered 126 S.Ct. 1014, 546 U.S. 413, 163 L.Ed.2d 995. Water Law ⟨⟩ 2650

# EXHIBIT C

THE SUPERIOR COURT OF CALIFORNIA

# COUNTY OF ALAMEDA

Log In

## DomainWeb

*your resource for case filing information*

**Buy Credits**
0 Credit(s)



**Checkout (0 item(s))**

**DomainWeb**    **How This Site Works**    **FAQ**

## Case Details

**Case Number: RG16825351**     **Title: Davidson VS Alcatel-Lucent USA INC.**

| Case Summary | Register of Action | Participants | Tentative Rulings |
| Future Hearings | Minutes | | |

| Date | Action |
|------|--------|

| Date | Action |
|------|--------|
| 10/7/2016 | This Tentative Ruling is made by Judge Brad Seligman The court intends to find that Plaintiffs William and Pearl Davidson are entitled to a trial preference under Code of Civil Procedure section 36(a) for reasons stated below, but the PARTIES ARE TO APPEAR to discuss the choice of a trial date (which Plaintiffs ask to be set in 50 days) and resolve scheduling issues arising from the grant of preference. (The court uses the term "Plaintiffs" to refer collectively to Mr. and Mrs. Davidson and "Plaintiff" to refer to Mr. Davidson in discussing his medical condition.) Plaintiffs are entitled to a preference by the undisputed facts that Plaintiff is 82 years old and was diagnosed in May 2016 with malignant pleural mesothelioma; that he has lost 30 pounds since his diagnosis and transitioned to hospice care; and that both a physician who spoke with him by phone and reviewed his medical records (Dr. Presser) and his treating oncologist (Dr. Hersch) have expressed (in a declaration and letter, respectively) a substantial doubt that he will survive beyond 3 months from September 22-23. Defendants oppose the motion and contend that Plaintiffs' evidence does not establish that Plaintiff's medical condition makes a preference necessary to avoid prejudicing his interest in the litigation (Code Civ. Proc., § 36(a)), but the evidence easily suffices for the reasons briefly noted above: Plaintiff is 82 years old, has mesothelioma, and has lost over 30 pounds since his diagnosis. While Defendants reasonably oppose Plaintiffs' request to set trial in 50 days, it is obvious that Plaintiffs are entitled to a preference. The parties are to meet and confer-before the hearing to the extent possible and otherwise thereafter-about (1) whether and to what degree Plaintiffs will stipulate to shorten the required notice period for motions for summary judgment and/or adjudication (MSJ/A) given Defendants' decision not to stipulate to a preference, and how close to trial to set the final date to hear such motions (which the court will find good cause to hear less than 30 days before trial); (2) the choice of a shortened period within which all parties must respond to written discovery requests, (3) the choice of deadlines (a) for all parties to disclose potential product-identification and PMQ/COR witnesses, (b) Plaintiffs to produce their economist's report, and (c) Plaintiffs to disclose bankruptcy filings; and (4) a protocol for handling pathology evidence, including any necessary destructive testing. (Plaintiffs' motion argues that the court lacks authority to condition the grant of a preference on agreements regarding such issues, but the court may take such considerations into account in deciding when to set a preference trial within the statutorily mandated 120-day period for doing so. The court will separately issue a pre-trial and trial-setting order. |

Page: 1 of 1

**Back to Search Results**

Feedback     Use and Privacy Policy     System Requirements     Contact Us     ® 2016 - Superior Court of California, County of Alameda